ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-0924 (Nicholas Pilgrim, Senior Trial Counsel)
E-mail: PilgrimN@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

HAROLD BAILEY "B.J." GALLISON, II (A.K.A.
BART WILLIAMS), MONEYLINE BROKERS,
BASTILLE ADVISORS, INC., CLUB CONSULTANTS,
INC., JUROJIN, INC., SANDIAS AZUCARADAS CR,
S.A., VANILLA SKY, S.A., ROGER G. COLEMAN, SR.,
ANN "ANNA" M. HISKEY, ROBIN M. RUSHING,
DAVID K. RUSHING, MICHAEL J. RANDLES,
WARRIOR GIRL CORP., CARL H. KRUSE, SR.,
CARL H. KRUSE, JR. (A.K.A. CARL KRUSE-
VELASQUEZ), ALLAN M. MIGDALL, NATURE'S
PEAK F.K.A. EVEROCK, INC., FRANK J. ZANGARA,
MARK S. DRESNER, CHARLES "CHUCK" S.
MOELLER, ROBERT S. OPPENHEIMER, ANTONIO
("TONY" OR "ANTHONY") J. KATZ, RICHARD S.
ROON, FRY CANYON CORPORATION, L.F.
TECHNOLOGY GROUP LLC, STARBURST
INNOVATIONS LLC, TACHION PROJECTS, INC.,
B.H.I. GROUP, INC., U D F CONSULTING INC.,
DIGITAL EDGE MARKETING LLC, CORE
BUSINESS ONE, INC., SPECTRUM RESEARCH
GROUP INC., OCEANIC CONSULTING LLC, and
AKAT GLOBAL LLC,

Defendants.

15-Civ.-  (  )

COMMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendants Harold Bailey Gallison, II ("Gallison"), Moneyline Brokers ("Moneyline"), Bastille Advisors, Inc. ("Bastille"), Club Consultants, Inc. ("Club Consultants"), Jurojin, Inc. ("Jurojin"), Sandias Azucaradas CR, S.A. ("Sandias"), Vanilla Sky, S.A. ("Vanilla Sky"), Roger G. Coleman, Sr. ("Coleman"), Ann M. Hiskey ("Hiskey"), Robin M. Rushing ("Robin Rushing"), David K. Rushing ("David Rushing"), Michael J. Randles ("Randles"), Warrior Girl Corp. ("Warrior Girl"), Carl H. Kruse, Sr. ("Kruse Sr."), Carl H. Kruse, Jr. ("Kruse Jr."), Allan M. Migdall ("Migdall"), Nature's Peak f.k.a. Everock, Inc. ("Everock"), Frank J. Zangara ("Zangara"), Mark S. Dresner ("Dresner"), Charles S. Moeller ("Moeller"), Robert S. Oppenheimer ("Oppenheimer"), Antonio J. Katz ("Katz"), Richard S. Roon ("Roon"), Fry Canyon Corporation ("Fry Canyon"), L.F. Technology Group LLC ("L.F. Technology"), Starburst Innovations LLC ("Starburst"), Tachion Projects, Inc. ("Tachion"), B.H.I. Group, Inc. ("BHI"), U D F Consulting Inc. ("UDF"), Digital Edge Marketing LLC ("Digital Edge"), Core Business One, Inc. ("Core"), Spectrum Research Group Inc. ("Spectrum"), Oceanic Consulting LLC ("Oceanic"), and AKAT Global LLC ("AKAT") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.  Beginning as early as January 2009 and continuing through at least September 2010, Costa Rica-based defendant Moneyline and its affiliated nominee entities, the defendants Bastille, Club Consultants, Jurojin, Sandias, and Vanilla Sky (collectively, including Moneyline, the "Moneyline Entities"), under the control of securities law recidivist Gallison, unlawfully operated as a broker-dealer on behalf of U.S.-based customers seeking to conceal their holdings of microcap securities and to manipulate the market for these thinly-traded issuers.

2

2.      The customers, working with the Moneyline Entities, penny stock promoters, and other associates, engaged in numerous "pump and dump" schemes, including by manipulatively trading the shares of microcap stock to create the illusion of genuine investor demand, orchestrating a promotional campaign to inflate the price of the stock (the "pump"), and then selling their shares into the demand that they generated (the "dump").

3.      The Moneyline Entities, through their employees, including defendants Gallison, Coleman, Hiskey, Robin Rushing, David Rushing, and Randles (together, the "Moneyline Individuals"), routinely accepted transfers of microcap stocks from U.S. customers, arranged for stock certificates to be re-issued in the names of the Moneyline Entities, and deposited the shares into various securities brokerage accounts the Moneyline Entities maintained at brokerage firms in the U.S.

4.      The Moneyline Entities thereafter followed customer instructions as to the sale or other disposition of the shares.  After sales were executed, the Moneyline Entities wired the proceeds, minus fees and commissions, back to their U.S. customers.

5.      The Moneyline Entities sold the securities of numerous microcap securities, largely on behalf of U.S. customers, for many millions of dollars.  This action concerns the unlawful unregistered distribution, offering, and sale of securities of two issuers:  Warrior Girl and Everock.

### *Warrior Girl*

6.      Defendants Kruse Sr. and Kruse Jr. (together, the "Kruses") conspired with the Moneyline Entities and the Moneyline Individuals to unlawfully distribute and manipulate shares of Warrior Girl, an issuer the Kruses controlled.

7.      In connection with this scheme, the Kruses used various nominee entities, defendants Fry Canyon, L.F. Technology, Starburst, and Tachion (together, the "Kruse Entities"), controlled by Kruse Jr.

8.      The Kruses, among other things, orchestrated several promotional campaigns to liquidate their secret Warrior Girl holdings; engaged in coordinated trading along with Gallison, Hiskey, Vanilla Sky, and Sandias; and made false statements to brokerage firms.

9.      Defendant Migdall aided and abetted Kruse Jr.'s violations by, among other things, helping Kruse Jr. conceal his substantial ownership of Warrior Girl stock and serving as an intermediary with the Moneyline Entities.

10.      The scheme also involved false and misleading public statements by Warrior Girl, in the form of press releases and filings on the OTC Markets website.

11.      Defendants Roon and Oceanic (a Roon-controlled company) promoted Warrior Girl stock without properly disclosing that Roon had received shares of Warrior Girl as compensation for the tout.

*Everock*

12.      Defendants Zangara, Moeller, and Dresner worked with the Moneyline Entities and the Moneyline Individuals to unlawfully distribute and manipulate shares of Everock stock.

13.      In connection with this scheme, these defendants used various entities, including defendants BHI and UDF (controlled by Zangara), defendant Digital Edge (controlled by Dresner), and defendant Spectrum (controlled by Moeller).

14.      Defendant Oppenheimer (along with his entity, defendant Core) also participated in this scheme by, among other things, acting as a conduit for the flow of stock sale proceeds from the Moneyline Entities to Everock.

15. Defendants Roon and Katz promoted Everock and unlawfully sold Everock shares in unregistered transactions through their entities, defendants Oceanic and AKAT.

16. In connection with this scheme, defendants Everock and Oppenheimer published false information in filings posted on the OTC Markets website.

## **VIOLATIONS**

17. By virtue of the conduct alleged herein:

    a. defendants the Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse Entities, Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

    b. defendant Migdall aided and abetted Kruse Jr.'s violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

    c. defendants Kruse Jr., Warrior Girl, Moeller, Oppenheimer, Everock, and Spectrum violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and defendants the Kruses are liable for Warrior Girl's Exchange Act violations, and defendants Moeller and Zangara are liable for Everock's Exchange Act violations, as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 77t(a)];

    d. defendants Roon and Oceanic violated the anti-touting provisions of Section 17(b) of the Securities Act [17 U.S.C. § 77q(b)];

5

e.   defendants Gallison, Hiskey, Kruse Jr., Sandias, and Vanilla Sky violated
Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)];

f.   defendants the Moneyline Entities and the Moneyline Individuals violated
Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

g.   defendants the Moneyline Entities, the Moneyline Individuals, the Kruses, the
Kruse Entities, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge,
Oppenheimer, Core, Roon, Oceanic, Katz, AKAT, and Migdall violated
Section 5 of the Securities Act [15 U.S.C. § 77(e)]; and

h.   defendant Gallison, as the control person of the Moneyline Entities, under
Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is liable for the
Moneyline Entities' violations of the Exchange Act.

18.   The Defendants will, unless enjoined, continue to engage in the acts, practices,
and courses of business alleged herein, or in transactions, acts, practices, and courses of business
of similar purport and object.

## JURISDICTION AND VENUE

19.   This court has jurisdiction over this action pursuant to Section 22(a) of the
Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d)(1), 21(e), and 27 of the Exchange Act [15
U.S.C. §§ 78u(d)(1), 78u(e), and 78aa].

20.   Venue is proper in the Southern District of New York pursuant to Section 22 of
the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].
Certain of the acts, practices, transactions, and courses of business alleged herein occurred within
the Southern District of New York.  For example, shares of Everock and Warrior Girl stock
transferred to the Moneyline Entities, the Kruses, the Kruse Entities, Zangara, Dresner, Moeller,

and others were held at the Depository Trust Corporation at 55 Water Street, New York, New

York. Additionally, multiple participants in the fraudulent scheme, including Moeller,

Oppenheimer, Zangara, Dresner, Bastille, Katz, AKAT, and Everock conducted transactions

with Everock's transfer agent, located at 17 Battery Place, New York, New York.

21.     The Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities

exchange in connection with the transactions, acts, practices, and courses of business alleged

herein.

## DEFENDANTS

22.     **Gallison**, a.k.a. Bart Williams, age 57, is a resident of San Diego, California.

Gallison is the founder and sole owner of Moneyline. At all times relevant to this Complaint,

Gallison, directly or indirectly, controlled the Moneyline Entities' activities. He opened at least

some of the accounts at U.S. brokerage firms that were used to liquidate customers' shares. He

personally gave trading instructions to the U.S. brokerage firms concerning the customer shares

at these accounts, and directed other Moneyline Individuals to execute trades in these accounts.

Gallison previously held supervisory and financial principal licenses (series 4, 7, 24, 27, 55, and

63) and worked from about April 1989 to August 1992 as a compliance manager and registered

representative for broker-dealer Burnett, Grey & Co., Inc. ("Burnett Grey"), and from about

August 1992 to April 1999 as principal and registered representative of broker-dealer Pacific

Cortez Securities Inc., f.k.a. La Jolla Capital ("La Jolla Capital"). He is a repeat securities law

violator. His extensive regulatory history includes: (i) a cease-and-desist order, along with

defendant Robin Rushing, for aiding and abetting Burnett Grey's violation of Exchange Act

Section 15(c)(2) and Rule 15c2-11 (*In the Matter of Robin Rushing and Harold ("B.J.")*

*Gallison, Jr.*, 1996 SEC Lexis 195 (Jan. 26, 1996)); (ii) an injunction in 2002 from violating the antifraud provisions and participating in any conduct in connection with the purchase or sale of any security (*SEC v. George Badger, et al.*, 2:97 CV 0963K (D. Utah 1997)); (iii) a penny stock bar and broker-dealer bar in 2004 (*In the Matter of Harold B. Gallison, Terrence J. Hughes and David Rosenthal*, Exchange Act Rel. 50522, Admin. Proc. File No. 3-11634 (Oct. 13, 2004)); (iv) an indictment, conviction, and sentencing to five years' imprisonment in state court for securities fraud (*Harold Bailey Gallison*, No. SCD154495 (Sup. Ct. Ca. filed Aug. 14, 2000)); and (v) a fine of $100,000 and over $14,000 in costs, by the National Association of Securities Dealers ("NASD") in 1998 for failure to supervise employees at La Jolla Capital.  The fine was affirmed by the Commission, and in 2005, a federal district court entered a judgment compelling Gallison to pay the NASD. *See* Order, *SEC v. Gallison*, Case No. 04cv1600 (S.D. Cal. Aug. 2, 2005).

23.    **Moneyline** is a self-described broker-dealer based in Costa Rica and controlled by Gallison.  During the relevant period, it employed ten or fewer individuals.  Moneyline conducted some of its business within the United States (in California, Florida, Nevada, and Washington State) and abroad through the U.S. and foreign corporations: Bastille, Club Consultants, Jurojin, Sandias, and Vanilla Sky.

24.    **Bastille**, a Moneyline Entity, is a Nevada corporation with its principal place of business in Nevada.

25.    **Club Consultants**, a Moneyline Entity, is a Nevada corporation with its principal place of business in Nevada.

26.    **Jurojin**, a Moneyline Entity, is a Nevada corporation with its principal place of business in Nevada.

8

27.     **Sandias**, a Moneyline Entity, is incorporated in Costa Rica and domiciled in San Jose, Costa Rica.

28.     **Vanilla Sky**, a Moneyline Entity, is incorporated in Costa Rica with its principal place of business in San Jose, Costa Rica.

29.     **Coleman**, age 79, resides in Las Vegas, Nevada.  Coleman is the president, treasurer, and director of Bastille.  Coleman is a securities recidivist who previously owned a registered transfer agent.  In 1988, Coleman and his transfer agent were enjoined from violating the antifraud provisions in connection with Coleman's falsification of shareholder records and failure to comply with books and records requirements.  *SEC v. Efficient Transfer, Inc. and Roger G. Coleman, Sr.*, No. 88-C-271W (C.D.Utah June 1988).   The Commission subsequently barred Coleman from association with any broker, dealer, investment adviser, investment company, transfer agent or municipal securities dealer.  *In the Matter of Roger G. Coleman, Sr.*, Exchange Act Rel. 26874, Admin. Proc. File No. 3-7079 (May 30, 1989).  In 1990, Coleman was indicted, convicted, and sentenced to 4 years' probation for securities fraud for counterfeiting a stock certificate to be used as collateral for a bank loan.  *United States v. Roger G. Coleman, Sr.* 90-CR-0084S (C.D.Utah March 1990).  The following year, Coleman was indicted, convicted, and sentenced to 24 months' imprisonment, followed by 2 years' supervised release, for securities fraud for the fraudulent offer and sale of securities.  *United States v. Roger G. Coleman, Sr.* 91-CR-0084W (C.D.Utah April 1991).  Since 2005, Coleman has operated Nevada entity Corporate Capital Formation, which is listed as a registered agent of, or shares mailing addresses with, numerous companies, including Bastille and Jurojin.

30.     **Hiskey**, a.k.a. Anna Hiskey, age 42, of Costa Rica, is a U.S. citizen.  Hiskey is an employee in Moneyline's office in Costa Rica and formerly worked with Gallison and Robin

Rushing at La Jolla Capital in California from about 1997 through 1998. Hiskey previously held Series 7, 63, and 65 licenses.

31. **Robin Rushing**, age 58, of Spokane, Washington, is a Moneyline employee. Along with her brother, David Rushing, she generally worked from, and resided in Spokane, Washington. She also sometimes worked in Moneyline's office in Costa Rica. Robin Rushing previously held Series 7, 24, 27, and 63 licenses, and, prior to working at Moneyline, reported to Gallison at La Jolla Capital, where she worked from March 20, 1992 to March 26, 1997, and Burnett Grey, where she worked from March 21, 1990 to April 8, 1991. She is a recidivist securities law violator. Along with Gallison, she was subject to a cease-and-desist order in 1996 in connection with market making activities at Burnett Grey. *In the Matter of Robin Rushing and Harold ("B.J.") Gallison, Jr.,* 1996 SEC Lexis 195 (Jan. 26, 1996). In 1999, while at Amber Securities Corp., then a registered broker-dealer, Robin Rushing was censured and fined $5,000 in connection with the violation of NASD rules and net capital requirements. NASD case C02980089 (May 1999).

32. **David Rushing**, age 59, processed stock transfers and performed other back office operations for the Moneyline Entities until at least August 2010. His primary residence, at all relevant times, appears to have been in Spokane, Washington. Along with his sister, Robin Rushing, he performed services for the Moneyline Entities in Spokane and in Costa Rica. He previously held Series 7, 24, and 63 licenses.

33. **Randles**, age 47, is a Canadian citizen believed to reside in Costa Rica, who supervised some or all of the employees in Moneyline's branch in Costa Rica until at least July 1, 2010. Randles was an officer of Vanilla Sky.

34.     **Warrior Girl** is a microcap issuer. It was incorporated in Nevada in 2002 and was a shell company until at least June 2010. During the relevant period, Warrior Girl was headquartered in Miami, Florida and controlled by the Kruses. In 2008, Warrior Girl purported to be in the business of hydroelectric power. In 2009, it claimed to be in the business of mining and extracting oil from tar sand. And in 2010, Warrior Girl claimed to be in the business of online education. Warrior Girl is not, and has never been, a reporting company. Warrior Girl is quoted on OTC Link, operated by OTC Markets Group Inc., under the ticker symbol WRGL.

35.     **Kruse Sr.**, age 75, is Kruse Jr.'s father and a resident of Miami, Florida. During the relevant period, Kruse Sr. held himself out as Warrior Girl's principal, employing a variety of titles including chief executive officer, president, secretary, senior vice president, and a director of Warrior Girl. He was licensed as a certified public accountant at various times between 1969 and 1990 in Puerto Rico, Florida, and New York.

36.     **Kruse Jr.**, a.k.a. Carl Kruse-Velazquez, age 50, is a resident of Miami, Florida and a dual U.S. and German citizen. He controlled the four Kruse Entities (Fry Canyon, L.F. Technologies, Starburst, and Tachion) and was an officer of all except Fry Canyon.

37.     **Migdall**, age 68, was a Florida lawyer and a resident of Fort Lauderdale, Florida. He was disbarred as a result of his refusal to comply with a subpoena served on him by the Florida Bar Association in September 2010.

38.     **Everock** is a microcap issuer incorporated in Nevada and based in Santa Cruz, California. It initially incorporated in Ontario as Digital Cybernet Corp. in 1999, and changed its name to Canadian Everock Explorations Inc. on November 20, 2000, then to Everock Inc. on November 6, 2002. In 2005, the company changed its domicile to Nevada and incorporated there. From March 2002 until July 2004, Everock made voluntary filings with the SEC. During

11

that time, Everock claimed in filings that it owned interests in mining properties but had not yet determined if the properties contained mineral resources.  In connection with a 2008 agreement to exchange shares with a company called Nature's Peak, Everock changed its name to Nature's Peak in December 2008.  The company thereafter claimed to produce and sell sandwich spreads and dips to customers in the U.S. and abroad.  Everock is quoted on OTC Link, operated by OTC Markets Group Inc., under the ticker symbol EVRN.

39.     **Zangara**, age 52, is a resident of Locust Valley, NY.  He is the principal of BHI, an unregistered entity.  Zangara became a registered representative in 1986 and held series 7, 24, and 63 licenses.  Zangara is a recidivist.  On June 3, 2004, Zangara was permanently enjoined from violating Section 10(b) and Rule 10b-5 thereunder and barred from associating with a broker or dealer, with a right to apply after five years, for engaging in insider trading.  *In the Matter of Frank J. Zangara,* Release No. 49805 (June 3, 2004).

40.     **Dresner**, age 59, lives in Dix Hills, NY.  He is the principal of Digital Edge, a New York limited liability company, which purportedly developed marketing strategies for companies, and holds himself out as Sales and Marketing Strategist, Direct Response Copywriter.  According to the website of Zangara entity BHI, Dresner is also BHI's Director of Marketing.  According to Dresner's website, www.markdresner.com, he has been involved in marketing, sales, and advertising for more than 30 years.  He founded a WebTV show called CEOInsiderTV.com, which featured interviews of CEO's targeting customers and potential investors.  The website also indicates that: "In the mid-1990's Mark co-founded a technology services company that grew from ZERO to over $82 Million in revenues. And he was personally responsible for managing the company's public company registration process with [the] SEC."

41.     **Moeller**, age 46, is a resident of Sea Cliff, NY.  He was a principal of Everock. He is the principal of Spectrum, which holds itself out as a small-cap report provider.

42.     **Oppenheimer**, age 57, resides in Belvedere Tiburon, California.  From at least December 2008 until June 2010, Oppenheimer was a principal of Everock, and served as secretary, director, and the investor relations contact.  Oppenheimer was CEO of Core, which purportedly provided financing to Everock.  According to filings posted on the OTC Markets website, Oppenheimer "is a corporate business consultant with more than twenty years of experience of increasing viability and profitability for clients."

43.     **Katz**, a.k.a. Tony or Anthony Katz, age 51, resides in Red Bank, New Jersey. Katz operates AKAT.  He worked for many years with Roon in a microcap stock touting business.

44.     **Roon**, age 56, resides in Rumson, New Jersey.  He operates OTCReporter.com and Oceanic, entities that tout stocks through internet postings and newsletters.  Roon pled guilty to mail fraud in 2000 and spent approximately one year in prison in connection with hiding losses and misappropriating $1.5 million invested in a hedge fund.  *United States v. Richard Roon*, 3:00-cr-00176 (D.N.J. 2000).  Roon was a registered representative with Series 3, 7, and 63 licenses.

45.     **Fry Canyon** is incorporated in the British Virgin Islands, with its principal place of business in Bermuda.  It shares an address with Tachion.  Kruse Jr.'s sister is secretary, and a Kruse associate is the nominal president (hereinafter the "nominee officer").

46.     **L.F. Technology** is organized in Nevis, with its principal place of business in Bermuda, where it shares an address with Starburst.  The nominee officer is identified as the president, and Kruse Jr. holds himself out as director.

13

47.    **Starburst** is organized in Nevis, with its principal place of business in Bermuda, where it shares an address with L.F. Technology.  Kruse Jr. holds himself out as president, and the nominee officer is the purported secretary.

48.    **Tachion** is incorporated in the British Virgin Islands, with its principal place of business in Bermuda, where it shares an address with Fry Canyon.  Kruse Jr. holds himself out as secretary, and the nominee officer is identified as the president.

49.    **BHI**, f.k.a. Beaudette Holdings Inc., is a New York corporation formed in 1993 with its principal place of business in Nassau County, New York.  It is owned and controlled by Zangara and his wife.

50.    **UDF** is an inactive New York entity that was incorporated in 2009 and dissolved in October 2011.  It was owned and controlled by Zangara.

51.    **Digital Edge** is a New York corporation controlled by Dresner with its principal place of business in New York.  Dresner advertised his marketing and sales experience on the website www.markdresner.com, which stated at the bottom "Digital Edge Marketing/Mark Dresner – All Rights Reserved."

52.    **Core** is a California corporation with its principal place of business in California. It purports to be a full service business consulting, training, and development firm.  Oppenheimer is the CEO, president, and registered agent.  According to the California Department of State, Core's corporate status is listed as suspended.

53.    **Spectrum** is a New York corporation controlled by Moeller with its principal place of business in Jericho, New York.  The entity through its website, spectrumresearchgroup.com, holds itself out as a provider of daily trading ideas and small-cap

reports.  Spectrum represents that it consolidates public information about companies that would otherwise go unnoticed by "typical wall street investors."

54.    **Oceanic** is a New Jersey corporation run by Roon, with its principal place of business in New Jersey.

55.    **AKAT** is a New Jersey corporation run by Katz, with its principal place of business in New Jersey.

## FACTS

**I.    The Moneyline Entities and Moneyline Individuals Solicited Broker-Dealer Customers in the United States Without Being Registered as Broker-Dealers.**

56.    From at least January 2009 until at least September 2010, the Moneyline Entities and Moneyline Individuals provided brokerage services from both the U.S. and Costa Rica to U.S. customers.  The Moneyline Entities and Moneyline Individuals acted as broker-dealers by, among other things, soliciting customers, handling customer funds or securities, maintaining customer accounts, placing orders at customers' instructions, holding securities through accounts in the names of the Moneyline Entities on behalf of others, and charging commissions.  The Moneyline Entities also provided their U.S. customers with online access to information about trades, an online account application and message system, and the ability to log in and enter transactions.

57.    The Moneyline Entities included Bastille, Club Consultants, and Jurojin, incorporated in Nevada, and Sandias and Vanilla Sky, incorporated in Costa Rica.  The Moneyline Entities opened numerous brokerage accounts at U.S. brokerage firms, including accounts in the name of Bastille at Broker A, Broker B, and Broker C.  Coleman and Robin Rushing had trading authority over each of these Bastille accounts.  Club Consultants had accounts at firms including Broker A and Broker D.  One of Coleman's nominees had trading

authority over the account at Broker A, and Broker A included Hiskey in e-mail communications pertaining to the account. Hiskey had trading authority over the account at Broker D. Jurojin, Vanilla Sky, and Sandias all had at least one brokerage account at Broker C, with Coleman having authority over the Jurojin account, Randles having authority over the Vanilla Sky account, and Randles and Robin Rushing both having authority over the Sandias account.

58.     Many of the services provided by the Moneyline Entities and Moneyline Individuals were provided in the U.S. Bastille, Club Consultants, and Jurojin had their principal places of business in Nevada. Gallison, David Rushing, and Robin Rushing often worked from the U.S., and Coleman was based in the U.S. The Moneyline Entities used U.S. telephone and facsimile numbers and a U.S. mailing address for communications with customers.

59.     The Moneyline Entities routinely accepted shares of microcap issuers from U.S. customers. In addition, the Moneyline Entities solicited new U.S. customers through Moneyline's website, which contained no known disclaimers advising prospective customers that they would not service U.S. investors. The Moneyline Individuals also reached out to existing U.S. customers by telephone to solicit additional business and encourage trading by the Moneyline Entities' customers.

60.     **Gallison** controlled the Moneyline Entities' operations. He had supervisory authority over the Moneyline Entities' staff and directed their operations, including in their daily interactions with customers. Gallison also orchestrated promotional campaigns for Moneyline customers. He opened some of the Moneyline Entity accounts at U.S. broker-dealers, and managed those accounts, including by giving trading instructions. Gallison had overall responsibility for Moneyline's website.

16

61.     **Hiskey** placed trades, assisted with wire transfers, and also solicited Moneyline customers to make trades in their Moneyline accounts.  Hiskey had trading authority over brokerage accounts in the names of Moneyline Entities, including Club Consultants.

62.     **Robin Rushing** placed trades, communicated with customers, and had trading authority over several accounts in the names of the Moneyline Entities, including Bastille and Sandias.  She directed the transfer of customers' shares into Bastille's accounts.

63.     **Randles** supervised some or all of the Moneyline staff in the Costa Rica office, and reported to Gallison.  He had trading authority over accounts in the names of the Moneyline Entities, including Vanilla Sky and Sandias.  He communicated with domestic brokerage firms about Moneyline Entity accounts, and directed the transfer of proceeds of microcap stock liquidations, typically into Moneyline Entities' bank accounts outside the U.S.

64.     **David Rushing** placed trades and facilitated the deposit of shares received from customers into brokerage accounts in the names of the Moneyline Entities.  He facilitated the clearing and processing of stock certificates received from customers, and also, in tandem with his sister, Robin Rushing, and Coleman, communicated with U.S. brokerage firms concerning the transfer and deposit of shares, daily trade reporting and other issues.  David Rushing also had trading authority over some accounts in the names of the Moneyline Entities, including Sandias.

65.     **Coleman** worked from his home in Las Vegas, Nevada and carried out Gallison's instructions.  He opened some of the Moneyline Entities' domestic bank and brokerage accounts, and had authority on many Bastille and Jurojin accounts.  Coleman oversaw the ongoing maintenance of at least some of the accounts, often at Gallison's instruction.  At Gallison's direction, he transferred stock trading proceeds to various domestic and offshore bank and

brokerage accounts of the Moneyline Entities, deposited money and securities into these accounts, and arranged for the transfer of customers' shares into some of these accounts. The Moneyline Entities and the Moneyline Individuals assisted U.S customers in the liquidation of numerous microcap securities.  As set forth below, this Complaint concerns unlawful and fraudulent conduct conducted by, and facilitated by, the Moneyline Entities and the Moneyline Individuals in connection with the stock of two microcap issuers, Warrior Girl and Everock, during 2009 and 2010.

II.     **The Fraudulent Business of Moneyline**

66.     At all relevant times, the primary service of the Moneyline Entities was to provide anonymity to customers who sought to manipulate the market for microcap stocks in the U.S. The Moneyline Entities' business model was to instruct U.S. customers to transfer microcap shares to U.S. brokerage accounts in the names of the Moneyline Entities.  By using the names of nominees including Bastille, Club Consultants, Jurojin, Sandias, and Vanilla Sky in opening their brokerage accounts and commingling the customers' shares in these accounts, the Moneyline Entities and the Moneyline Individuals concealed from the broker-dealers their customers' beneficial ownership of shares.  By trading through numerous nominee accounts, the Moneyline Entities and the Moneyline Individuals created the false impression that unrelated parties were buying and selling the stock and that the market was deeper than the reality.

67.     The scheme enabled U.S. customers, many of whom were affiliates or promoters of issuers such as Warrior Girl and Everock, to conceal from investors that the customers were the true, ultimate beneficial owners of shares held in accounts opened in the names of the Moneyline Entities.

68.     The Moneyline Entities and the Moneyline Individuals facilitated the deposit of

customers' shares that were issued in unregistered transactions to the Moneyline Entities' U.S. brokerage accounts, in order to dump shares on the unsuspecting public through a byzantine trading structure designed to avoid detection by criminal and regulatory authorities.

69.     The Moneyline Entities and the Moneyline Individuals misrepresented to the U.S. broker-dealers that they were the beneficial owners of all income relating to its brokerage accounts, in effect representing that the Moneyline Entities were the beneficial owners of the stock.  However, the Moneyline Entities and the Moneyline Individuals kept secret, internal records in which they credited their customer accounts at Moneyline with the shares that the customers transferred to the Moneyline Entities.

70.     The Moneyline Entities and the Moneyline Individuals also tried to evade regulatory scrutiny and conceal the extent and nature of their customers' activities by dividing up customers' shares among numerous Moneyline Entities and accounts, in order to minimize the percentage ownership of shares of an issuer by any one entity or account.

71.     As described below, various Moneyline Entities and Moneyline Individuals also assisted customers with market manipulation schemes by directing matched trades.  These manipulative trades were designed to create the illusion of genuine investor demand and thereby induce others to purchase the customers' stock.

72.     For its services, the Moneyline Entities charged commission of about $25 per trade, plus 5 percent of the trade value, and also passed on to its customers the commissions and fees assessed by the domestic brokers for selling the shares from the Moneyline Entities' accounts at U.S. brokers.  After settlement, the Moneyline Entities would transfer sales proceeds via wire transfer to their various bank accounts in the U.S. and overseas, and wire these proceeds (net of commissions) to their customers, who were generally located in the U.S.

73.    As part of its fraudulent operation, the Moneyline Entities along with the Moneyline Individuals assisted customers by coordinating promotional campaigns, during which the Moneyline Entities liquidated shares for its own account and on behalf of customers and remitted proceeds to its customers.

74.    The Moneyline Entities and the Moneyline Individuals knowingly operated an illegal, fraudulent enterprise, and they took steps to conceal their violative conduct.  For example, in February 2010, the Moneyline Entities attempted to camouflage their status as unregistered broker-dealers in the U.S. by seemingly relocating the business from Washington State to Costa Rica.  On or about February 24, 2010, Robin Rushing explained in a telephone call with a Moneyline customer that the Moneyline Entities were in the process of shutting down their Spokane, Washington branch "because . . . we could be accused of running an unregistered brokerage firm . . . within the U.S. boundaries."  She told the customer that to avoid this, the Moneyline Entities needed to establish a presence in Costa Rica, which would require her to travel to that nation to stay periodically.  That same day, Robin Rushing in effect acknowledged to a different customer that the Moneyline Entities operated as unregistered broker-dealers to U.S. customers.  Explaining why she would occasionally have to work from Costa Rica before returning to the U.S., she told the customer: "the big worry was . . . operating an unregistered brokerage firm . . . in Spokane . . . because everybody was calling the number [in Spokane]."  She instructed the customer to use the Moneyline Entities' new offshore telephone number, which she would simply forward or "attach" to her cell phone when she returned home to provide brokerage services in the U.S.  Robin Rushing even suggested that to enhance the illusion of Costa Rica being her "new place of residence," she would "put a couple Costa Rica

pictures up on her Skype" so that it appeared to those trying to contact her that she was located outside the U.S.

75.     Two days later, Gallison reminded Robin Rushing that when she "sneak[s] back to Spokane" to work, she should remember that she will be working from home, the implication being that she should not tell customers that she was working from a Moneyline Spokane office. Gallison stated that many of Moneyline Entities' customers believed that "the whole Moneyline Brokers business is the Spokane office" and that "the Department of Justice . . . [would] have no problem getting people to get on the stand and swear on the Bible that the Spokane office was Moneyline Brokers."

76.     Even after these conversations about closing the Spokane office, the Moneyline Entities still maintained their ties to the U.S., and Spokane specifically, including through their continued use of a Spokane mailing address.  For example, on June 23, 2010, David Rushing told Gallison that, according to Robin Rushing, a brokerage firm had mailed a stock certificate to the Spokane mailing address.  David Rushing, who lived in Spokane, told Gallison that he had checked the Spokane mailbox the previous day for the package and would check again the next day.  Gallison relayed in this same conversation that Coleman was able to mail documents to Oppenheimer from Las Vegas, without raising compliance concerns, by sending documents in the name of an individual nominee.

77.     Randles also was aware that the Moneyline Entities activities were illegal, and he worried about being arrested for his participation.  For example, on June 7, 2010, prior to traveling out of Costa Rica, Randles expressed concern to Gallison that Randles would be "hauled off" a plane and arrested while traveling outside of Costa Rica due to the Moneyline Entities' illicit activities.  Gallison attempted to put Randles at ease by telling him that "the SEC

doesn't know . . . you've done more than $100,000 worth" of transactions and "the first couple times doing [illegal] stuff . . . when the SEC raps your knuckles . . . it's civil," so there [would be] no concern about being arrested in a criminal proceeding. Gallison told Randles that he should not worry, because "the whole issue with [the Moneyline Entities] is that . . . it's tough . . . for anyone to figure out what . . . we are doing in the first place." Gallison then encouraged Randles to "go have a nice trip and make us some money!"

78.     On June 23, 2010, David Rushing and Gallison also discussed keeping their names off the U.S. brokerage accounts in the names of the Moneyline Entities, and structuring payments under $10,000 to evade scrutiny. Gallison told David Rushing that he gave Hiskey trading authority over the Club Consultants brokerage account at Broker D, and instructed David Rushing to use Hiskey's name instead of his own on communications with the firm because "we do not want to screw up this [account]." Gallison then instructed David Rushing to withdraw funds from an account in the name of one of the Moneyline Entities in small increments under $10,000 so as not to arouse suspicion. David Rushing concurred that "we just want to keep it under 10 wherever possible."

79.     The Moneyline Entities and Moneyline Individuals also were aware of the dubious backgrounds of customers who turned to the Moneyline Entities to dump shares. On June 30, 2010, Gallison told Randles that two promoters, who had participated in a promotion to manipulate the market for Everock stock in June and July 2009, were sued by the Commission for their participation in "pump and dumps." Gallison said that generally these two promoters' "outrageous claims [in touts] were just pure bogus bullshit" and what they did was "so profitable" and "such a scam." Randles told Gallison that these promoters had Moneyline

accounts, to which Gallison replied that one still held stock and owed the Moneyline Entities several hundred dollars.

### III.   The Unregistered and Fraudulent Distribution of Warrior Girl Stock

*A.*   *Warrior Girl's History and Financial Condition*

80.   Warrior Girl was incorporated in Nevada in 2002, and was a shell company until at least June 2010.  Its purported business changed from hydroelectric power (2008) to mining and extracting oil from tar sand (2009) to online education (2010) to social media (2012).  As of July 2015, the OTC Markets website lists Warrior Girl's lines of business as "an umbrella and incubator for online [websites] . . . with potential."  From at least 2008 through 2011, it was headquartered in Miami, Florida and operated by Kruse Sr., who held himself out as Warrior Girl's president, among other titles, and Kruse Jr., who was an undisclosed control person.  According to its filings, during 2009, Warrior Girl had no revenue or liabilities, and *de minimus* assets.

B.   *The Kruses' Ownership and Control of Warrior Girl Shares*

81.   Since as early as 2009, the Kruses secretly controlled blocks of Warrior Girl shares and repeatedly pumped Warrior Girl stock through baseless promotions.  To conceal their ownership and control of Warrior Girl shares, Kruse Jr. opened U.S. brokerage accounts in the names of the Kruse Entities (Tachion, Starburst, L.F. Technologies, and Fry Canyon), and named another individual, the nominee officer, as the main person with authority over these accounts.  However, the Kruses directed the activity in these accounts, including purchases and sales of Warrior Girl shares and the transfer of significant blocks of Warrior Girl shares to the Moneyline Entities.  The Kruses also made payments from the Kruse Entities' brokerage accounts to nominees and promoters who traded Warrior Girl stock in other accounts.

23

82.     From January 26, 2009 through November 22, 2011, accounts controlled by the Kruses sold a total of approximately 13.3 million Warrior Girl shares, generating approximately $2.3 million in proceeds.

C.      *The 2009 Warrior Girl Promotion and Manipulative Trading*

83.     From approximately January 2009 through June 2009, the Kruse Entities and their associates dominated the market for Warrior Girl stock, and accounted for at least 69 percent of the Warrior Girl trading volume.  This manipulative trading set the stage for later promotional campaigns by making it seem as if Warrior Girl stock had a history of being actively traded.

84.     During this period, Kruse Jr. and some of the Kruse Entities engaged in matched trades involving Warrior Girl shares, including the following:

| Trade Date | Account | Bought/Sold | Number Warrior Girl Shares | Price |
|---|---|---|---|---|
| 2/23/09 | Tachion | Bought | 14,000 | .20 |
| 2/23/09 | L.F. Technology | Sold | 14,000 | .20 |
| 2/23/09 | Starburst | Bought | 100 | .33 |
| 2/23/09 | Tachion | Sold | 100 | .32 |
| 2/25/09 | Tachion | Bought | 20,000 | .22 |
| 2/25/09 | Kruse Jr. | Sold | 20,000 | .22 |
| 2/25/09 | Starburst | Bought | 100 | .32 |
| 2/25/09 | Starburst | Sold | 100 | .32 |

These transactions constituted 100 percent of the trading on February 23 and 25, 2009.

85.     In June and July 2009, the Kruses paid for and orchestrated two promotional campaigns.  Immediately after the two-day-long June 2009 campaign, Warrior Girl's trading volume jumped 4,250 percent on June 12, 2009 over the prior day's trading, and the price rose 88 percent.  Kruse Jr. later recounted to Hiskey that he and his father had generated $1 million

"of buying" demand with the promotion in June 2009. The Kruses sold into the demand that they created, as follows: Accounts controlled by the Kruses – including accounts in the names of Starburst, Tachion, L.F. Technology, Kruse Jr., and a joint account held by Kruse Sr. and his wife – sold more than one million shares on June 12, 2009, which accounted for approximately 36 percent of the shares sold, for proceeds of approximately $431,800. After another two-day promotional campaign in July 2009, accounts in the names of Starburst, Tachion, L.F. Technology, Kruse Sr., and a joint account held by Kruse Sr. and his wife sold over 1.8 million shares for proceeds of approximately $967,000 on July 9, 2009. In total, the Kruses generated more than $1.5 million in proceeds by selling Warrior Girl stock during the height of these promotions.

      D.    *The First Warrior Girl Promotional Campaign with the Moneyline Entities*

    86.    By February 2010, the Kruses turned to Moneyline to facilitate a larger-scale manipulation of Warrior Girl stock. The Kruses approached Moneyline through attorney Migdall, and sought, with Migdall in the lead, to secure both the use of Moneyline's nominee accounts – to hide their control over Warrior Girl stock – and Moneyline's assistance in identifying promoters to carry out a pump-and-dump scheme. Migdall was tasked with coordinating the illicit deal. Migdall's responsibilities included: (i) overseeing the amount and distribution of compensation to the promoters; (ii) memorializing the terms of payment to the promoters; (iii) maintaining control over who was authorized to trade the Kruses' shares; and (iv) controlling a Moneyline "escrow" account in his name that held the Kruses' shares that were to be liquidated in the promotion.

    87.    Starting on February 26, 2010, Hiskey and Gallison planned the manipulation. Gallison advocated an approach whereby, instead of paying promoters directly, the Moneyline

Entities would deposit Warrior Girl shares into an "escrow" account at Moneyline, such as Migdall's. The promoters would be paid from this account based on their performance, meaning how much volume they created. Gallison told Hiskey: "[W]e stick [the Warrior Girl shares] in escrow account [sic], and if the promoter creates volume, fuck it we're selling into it . . . and charging commission to the account, and then [the clients] can direct [how much the promoters are] paid." Hiskey explained to Gallison that, at her suggestion, the Moneyline Entities would receive the Warrior Girl shares, in increments no larger than 5 percent, apparently to minimize the percentage of shares held by any one entity. Hiskey worked over the next several weeks to negotiate the terms of the deal with Migdall and locate a promoter to create demand for Warrior Girl stock.

88.     On or about March 1, 2010, in furtherance of the Warrior Girl scheme, Kruse Jr. transferred 6.2 million Warrior Girl shares from L.F. Technology's account at Broker E to Migdall's account at Broker D.

89.     On March 16, 2010, also in furtherance of the arrangement, Kruse Jr. transferred 2.5 million Warrior Girl shares from Tachion's account at Broker F to Vanilla Sky, followed on March 22, 2010 by an additional 6.2 million Warrior Girl shares transferred from Starburst's account at Broker E to Vanilla Sky.

90.     The next day, on March 23, 2010, Hiskey excitedly advised Migdall by telephone that she had received 8.7 million Warrior Girl shares in the Vanilla Sky account, to which Migdall replied "You did? Congratulations! . . . Maybe you'll . . . start making a few dollars here." Migdall instructed Hiskey to credit all 8.7 million Warrior Girl shares to Migdall's "escrow" account at Moneyline, which was the type of arrangement recommended by Gallison.

91.     Migdall informed Hiskey to hold off on trading the shares because he "need[s] to

give [Hiskey] instructions on the sell . . . ."  Hiskey assured Migdall that the promoter was
"planning and conniving" to get the promotion going and had just been waiting for the 8.7
million Warrior Girl shares to hit.  Hiskey promised that "once [the promoter is] really ready to
get something going [she] will alert [Migdall]" and she hoped they could "all make some
money."  A few hours later, Migdall called Hiskey to relay that the client, meaning the Kruses,
authorized trading of the shares and stated that "as far as disbursing any [proceeds], wait for me
[to give instructions according to an agreement]."  Hiskey responded that Moneyline is "just
going to pretty much dump [the shares] as we can . . . and then . . . pay everybody accordingly."

92.    On or about April 13, 2010, Migdall and Hiskey finalized the terms of
compensation to the promoters, whereby the promoter would get 30 percent of whatever
proceeds were attributable to the promoter's campaign, with the remaining 70 percent credited to
Migdall's Moneyline account.  Migdall agreed to release a few million shares at a time to the
promoter and his associates but emphasized that any unsold shares should also be returned to his
Moneyline account.  Hiskey, acknowledging that it might take the promoter up to three months
to sell the shares, told Migdall that she would rather that the promoter takes his time to "bring up
the price or maintain it" so that the price would not crash.  She also told Migdall that she hoped
the promoter's efforts would lead to more Warrior Girl stock being transferred into the
Moneyline Entities because "of course [she wants] the commission."

93.    During the ensuing promotional campaign, Warrior Girl issued at least two press
releases.  On April 26, 2010, Warrior Girl announced that it would acquire ACES, an online
education provider.  Warrior Girl's stock price surged 60 percent, from a high of $.05 the prior
trading day to a high of $.08 on April 26, 2010.  Sandias sold 44,150 Warrior Girl shares that day
for proceeds of $2,956.  During the four-day period from April 26, 2010 through April 30, 2010,

the Kruses sold 107,760 shares for proceeds of $6,160 through accounts they controlled. On May 17, 2010, Warrior Girl again announced the acquisition of ACES and also the appointment of a new CEO. This announcement failed to significantly boost the share price or trading volume, but Starburst, Tachion, L.F. Technology, Kruse Sr., Jurojin, and Sandias managed to sell some shares.

94.     Migdall planned to capitalize on any significant price increase resulting from the promotions. He entered the following limit orders to sell from his account at Broker D some of the Warrior Girl shares that he received from L.F. Technology, as follows: (i) order entered on May 13, 2010 to sell 25,000 shares at .085; (ii) order entered on May 13, 2010 to sell 25,000 shares at .08; (iii) order entered on May 17, 2010 to sell 10,000 shares at .065; (iv) order entered on May 17, 2010 to sell 10,000 shares at .067; and (v) order entered on May 17, 2010 to sell 10,000 shares at .075. The orders expired without being executed, because the first Warrior Girl promotion failed to sufficiently boost the stock price.

95.     The Kruses considered this promotional campaign such a flop that they both demanded Moneyline return at least some of the Warrior Girl shares that had been paid out to promoters. On June 8, 2010, for example, Kruse Jr. complained to Hiskey that his group put out press releases based on the promoters' representations, but then had to "[buy their] own stock in the market," to "move the stock up and fortify the bids and asks."

96.     From the start of this promotion on April 26 until May 19, 2010, the last trading day in Warrior Girl stock before Kruse Jr. demanded his shares back from Hiskey on June 8, 2010, Kruse-related accounts held in the names of Starburst, L.F. Technology, Tachion, and Kruse Sr. purchased 2,250 shares while selling approximately 133,060 shares.

E.     *Moneyline and Warrior Girl Execute a*
       *Second, Fraudulent Promotional Campaign.*

97.     On or about June 9, 2010, in preparation for the next promotion, Migdall

transferred the 6.2 million Warrior Girl shares from his account at Broker D to a brokerage

account in Fry Canyon's name.

98.     As early as June 2010, Hiskey was in frequent, direct contact with both Kruses

about planning a new promotion.  For example, on June 8, 2010, Kruse Sr. told Hiskey that he

had 40 million Warrior Girl shares available for transfer to Moneyline and "we have a good

program . . . a good story, why don't you put [the promoters] in touch with us?"

99.     Gallison selected a promoter ("Warrior Girl Promoter") to run the new Warrior

Girl promotion.  Gallison, Hiskey, and Kruse Jr. planned the timing and the content of the

upcoming promotion.  Kruse Jr. and Hiskey agreed to work on six to eight releases together to

put out over the span of a week or two.  At the same time, Gallison and Hiskey also plotted how

much to manipulate Warrior Girl's price.  Gallison said that they did not need to move the price

up as long there is volume, and they should start the price low so that the price has a chance to

move up.

100.    Hiskey explained to Kruse Jr. that the Warrior Girl Promoter planned to create

volume in the range of 50 to 60 million shares once the Kruses issued news releases, and

mentioned that she had discussed the promotion with Kruse Sr.  On June 15, 2010, Hiskey

reassured Kruse Jr. about various aspects of the promotion, including that the Moneyline

Entities: (i) would let the Kruses know when "the buying is going to come in so you guys could

sell all your shares out from wherever you have the rest of them placed" to profit from the rise in

price due to the promotion; (ii) had a "nice, brand new, spanking clean" account in the name of

Club Consultants to receive stock; and (iii) just want "enough shares in-house, we'll definitely

sell some on your behalf, but so that we can pay the [promoters]." Kruse Jr. responded "that's fine" and "perfect!" Kruse Jr. and Hiskey discussed transferring the shares from Migdall's escrow account at Moneyline to a Moneyline account in the name of Kruse Sr. Hiskey discouraged this because Kruse Sr. "is an officer," and encouraged Kruse Jr. to transfer the shares instead to a Moneyline account in the name of one of the Kruse Entities. Concerned about triggering affiliate status after repeated reminders from Gallison, Hiskey told Kruse Jr. that Moneyline did not "want to sell all 40 million shares within Moneyline itself, but would possibly bring in another block of shares under 10 million to a different account" at Broker D. On June 18, 2010, Kruse Jr. transferred an additional 8 million Warrior Girl shares to a U.S. brokerage account in the name of Moneyline's nominee, Club Consultants.

      101.    On June 21 and 22, 2010, Kruse Sr., one of the Kruse Entities (Starburst), and a Moneyline Entity (Jurojin) engaged in coordinated trading to create the appearance of activity in Warrior Girl shares:

| Trade Date | Account Name | Bought/Sold | Number Warrior Girl Shares | Price |
|---|---|---|---|---|
| 6/21/10 | Starburst | Bought | 200 | .08 |
| 6/21/10 | Jurojin | Sold | 200 | .08 |
| 6/22/10 | Kruse Sr. | Bought | 8,000 | .04 |
| 6/22/10 | Jurojin | Sold | 8,000 | .04 |

These trades represented 61 percent of the volume traded on June 21 and 100 percent of the volume on June 22.

      102.    From June 29, 2010 through late afternoon on July 1, 2010, the Warrior Girl Promoter encouraged Hiskey to get the Kruses and the new Warrior Girl CEO to draft suitable press releases in time for the Fourth of July holiday, complaining that the earlier drafts were

30

"terrible" and "obsolete." The Warrior Girl Promoter demanded that Warrior Girl, within days, provide several "strong" press releases that referenced "revenues and statistics" for him to proofread.

103.    On June 29, 2010, Hiskey called Kruse Sr. to pass along the Warrior Girl Promoter's dissatisfaction. Kruse Sr. directed Hiskey to contact the new Warrior Girl CEO, who would have several press releases "ready to go." Surprised that the Warrior Girl Promoter wanted to start the promotion before the July 4 holiday, Kruse Sr. pledged to expedite the setup of Warrior Girl's website and confirmed with Hiskey that Moneyline had enough Warrior Girl shares to profitably liquidate during the promotion, because there was not enough time to transfer additional shares to Moneyline. Hiskey explained that Moneyline would liquidate its shares on the Kruses' behalf, but the Kruses should also be ready to sell their shares in other accounts for the promotion to be a success.

104.    Hiskey then called the Warrior Girl CEO to pressure him to provide numbers and statistics about the online school affiliated with ACES and Warrior Girl to include in the press releases. The CEO, also surprised by the imminence of the promotion, objected to the timing because he was still trying to launch the school and Warrior Girl actually had no revenue. The online school had just incorporated three weeks prior. The CEO stated that any press release at that point would be based on "air." At Hiskey's continued insistence and warning that they would lose the promoter's participation, the CEO agreed to draft several "fluffy" releases.

105.    The Warrior Girl CEO and the Kruses then worked together to submit a draft press release to the Warrior Girl Promoter that included false and grandiose projections. In the resulting press release, which was issued on July 1, 2010, Warrior Girl, which had not yet generated any revenue, forecast revenues from the operation of its "fully licensed" online school

31

at over $2 million after the first year, over $8 million the second year, over $27 million the third year, and more than $245 million the fifth year. These "fluffy" statements, which were misleading and had no reasonable basis whatsoever, were repeated on multiple promotional sites on July 1, 2, and 6, 2010.

106.    In addition to relying on a "fluffy" press release based on "air", as part of this promotional campaign the Warrior Girl Promoter hired well-known microcap stock promoters, partners Roon and Katz, to assist with the promotion. Roon's website OTCReporter.com featured Warrior Girl as its July 2, 2010 pick of the day, but did not properly disclose his compensation of 2 million Warrior Girl shares. Meanwhile, Katz, Roon, and Vanilla Sky engaged in matched trading that created the appearance of an active market for Warrior Girl shares. For example: the total volume of trading in Warrior Girl stock on July 2, 2010 was only 21,100 shares. At 3:58 p.m., Oceanic (a Roon-controlled entity), through Vanilla Sky, sold 10,000 Warrior Girl shares and about 4 minutes later an AKAT (Katz entity) brokerage account purchased 20,000 shares (AKAT's purchases were nearly 100 percent of the reported purchases that day, and included the majority of the 10,000 shares sold by Oceanic through Vanilla Sky); on July 6, 2010,Vanilla Sky sold a total of 53,000 shares and the AKAT account purchased 70,000 Warrior Girl shares (the 70,000 shares were 67 percent of the purchase volume for that day); the next day AKAT purchased 20,000 Warrior Girl shares in the morning and sold 20,000 Warrior Girl shares later that day through a different account at the same price it purchased in the morning.

107.    Vanilla Sky sold a total of only 123,500 Warrior Girl shares, 50,000 of which were on behalf of Oceanic, between July 2 and 7, 2010 for proceeds of $3,820. Kruse Entities' accounts (L.F. Technology and Starburst) sold an additional 61,566 Warrior Girl shares on July

32

14 for proceeds of $1,211. Kruse Jr. considered this second promotional campaign conducted in

conjunction with Moneyline to be a failure as well and again complained to Hiskey.

F.     *Additional Unlawful Trading and Re-Consolidation of Warrior Girl Shares*

i.     *Solicitation and Re-Consolidation*

108.    After the second pump-and-dump promotion with the Moneyline Entities

concluded, Hiskey and Kruse Jr. tried to make the scheme to manipulate the price of Warrior

Girl stock profitable for the Kruses and the Moneyline Entities by consolidating Warrior Girl

shares in Kruse Jr.'s hands in anticipation of yet another promotion. To accomplish this goal,

Kruse Jr. asked Hiskey to request that promoters who had previously received shares from Kruse

Jr. as part of the earlier promotional campaigns return their shares to Kruse Jr. On July 15, 2010,

Hiskey called two Moneyline customers, who were promoters in the U.S., to solicit their sales to

Kruse Jr. of a total of 350,000 Warrior Girl shares that they had previously received from Kruse

Jr.

109.    On July 27, 2010, Kruse Jr. and Hiskey further discussed their plan that Kruse Jr.

would buy back stock from the promoters and then undertake a big promotional effort himself in

the next 5-6 weeks. On or about July 27, 2010, Hiskey transferred 100,000 Warrior Girl shares

from a promoter's Moneyline account to Kruse Jr.'s Moneyline account at a previously agreed

upon price. On August 11, 2010, Moneyline effectuated the sale of another promoter customer's

shares to Kruse Jr. through an open market, prearranged trade between Vanilla Sky and an

account controlled by Kruse Jr. Specifically, Hiskey placed an order to sell 250,000 Warrior Girl

shares at $.011 from the Vanilla Sky account, knowing that an account controlled by the Kruses

would place an order to buy the same number of shares at the same price. In fact, Kruse Jr. and

Hiskey had raised their original agreed upon price from $.01 to $.011 to ensure that their orders

would match without interference from other outstanding orders on the market. These were the only Warrior Girl shares traded that day. Gallison placed the sell side of the trade after learning from Hiskey that Kruse Jr. wanted to engage in a prearranged trade that would earn Moneyline a "hefty commission."

ii.   *Gallison's Flagged Matched Trade and Impersonation of Authorized Traders*

110.    Also on July 27, 2010, Gallison entered matched orders to buy and sell 100,000 Warrior Girl shares in two Moneyline accounts (Sandias and Vanilla Sky) held at U.S.-based Broker C, in an attempt to create the illusion of market activity and investor demand. As Gallison later recounted to Randles, Gallison mistakenly placed these orders through the same firm. The orders, placed within seconds of each other and immediately executed, triggered a review by a Broker C compliance officer who noted that Randles was listed as an officer on both accounts.

111.    On August 5, 2010, the Broker C compliance officer e-mailed Sandias and Vanilla Sky, requesting an explanation of the apparent "prearranged" trade. Gallison responded to both e-mails with concocted explanations. In response to the Vanilla Sky e-mail, he pretended to be a Moneyline employee ("J.S.") with trading authority on that account. In response to the Sandias e-mail, he claimed to be Robin Rushing. Among other things, Gallison, as J.S., e-mailed the compliance officer that Randles had not been an officer of Vanilla Sky "since late spring." To corroborate this lie, on August 6, 2010, Gallison instructed his secretary to create a backdated trading authorization and corporate resolution for Broker C "for like sometime in late May [2010]" that removed Randles as an officer. In separate calls on August 6, Gallison discussed with David Rushing and Randles by telephone about how he concocted these e-mail responses to the Broker C compliance officer's questions. For example, Gallison explained to David Rushing

that he "keep(s) changing a word or two . . . because you don't want to make it seem like the same person wrote [the e-mails]." Gallison further explained to David Rushing that he drafted the e-mail in such a way that J.S. "seems to know what he's talking about" while "Robin [Rushing] knows less what she's talking about but still has some helpful information." After receiving Gallison's false explanations for the matched trades, Broker C canceled the trades without further inquiry.

        G.    *Warrior Girl Launches a Third Fraudulent Promotional Campaign with Moneyline.*

112.    On September 14 and 22, 2010, Warrior Girl issued press releases announcing that it had retained an investor relations firm and improved its listing on markets.com. On October 12, 2010, Warrior Girl issued a press release announcing that one of its online schools was operational. This press release was false: as subsequently acknowledged by Warrior Girl in its September 30, 2010 quarterly disclosure statement, filed on November 15, 2010, Warrior Girl's online education venture was only a "proposed business" and it had never had any permanent employees. Moreover, although the disclosure statement indicated that Warrior Girl "expects to generate revenue" and cash flow from operations in the following three months, according to the December 31, 2010 balance sheet filed by the company, the company had $0 in revenue as of the end of 2010.

113.    After the factually-unsupported October 12 announcement, various promotional sites continued to tout Warrior Girl stock, many disclosing that they had been compensated by Tachion or Starburst, with no mention that these entities were affiliated with the Kruses (who controlled Warrior Girl).

114.    Tachion, L.F. Technology, Starburst, and some of the Moneyline Entities sold Warrior Girl shares during the third fraudulent promotional campaign. From September 17,

35

2010 through October 22, 2010, Vanilla Sky sold nearly 1 million Warrior Girl shares for proceeds of about $77,000. From September 7, 2010 through October 29, 2010, accounts controlled by the Kruses outside of Moneyline (in the names of Tachion, L.F. Technology, and Starburst) sold about 3,464,406 Warrior Girl shares, for proceeds of about $151,626. Since March 24, 2010, some or all of the Moneyline Entities, including Sandias, Jurojin, Bastille, and Vanilla Sky made market purchases and sales of Warrior Girl shares. This trading, including sales by Jurojin and Bastille in September 2010 during the third fraudulent promotional campaign, gave the appearance that Warrior Girl was an actively traded stock.

     H.    *Other Fraudulent Conduct in Connection with Warrior Girl*

          i.    *False Statements by Kruse Jr. to Brokerage Firms*

     115.    As early as 2005, Kruse Jr. repeatedly impersonated an acquaintance who had trading authority over various Kruse Entity accounts (previously identified as the "nominee officer"), in order to mask Kruse Jr.'s control over Starburst and L.F. Technology accounts at Broker E that he used to dump Warrior Girl shares. This fraudulent conduct included written misrepresentations in which Kruse Jr. pretended to be the nominee officer. For example, instruction letters presented to Broker E for the transfer of blocks of Warrior Girl shares to Vanilla Sky, bear the forged signature of the nominee officer as well as the forged signature of Kruse Jr.'s sister, as notary.

     116.    Kruse Jr. also made misstatements to other brokerage firms to conceal his and Kruse Sr.'s ownership and control of Warrior Girl stock. For example, on June 6, 2009, Kruse Jr. submitted documents to open a new account at Broker F in his name. He falsely represented that neither he, "his spouse, nor any other immediate family members, including his parents" was "an officer, director or 10% (or more) shareholder in a publicly owned company." This was a

36

fraudulent representation.  As Kruse Jr. well knew, at that time his father (Kruse Sr.) held himself out as Warrior Girl's principal as well as its president.

117.    In addition, roughly five days later, Kruse Sr. directed the issuance to (Kruse Entity) Tachion of 21 million Warrior Girl shares, or roughly 27 percent of the issued and outstanding shares.  According to the transfer agent instruction letter from Kruse Sr., Tachion actually had owned the shares since 2006, but they were issued to another entity in error.  When he signed the account agreement with Broker F on June 6, Kruse Jr. agreed to advise the firm promptly about any material changes to the information provided.  At a minimum, he should have notified the firm that on June 11, 2009, about 27 percent of the issued and outstanding shares of Warrior Girl were "officially" transferred to an entity, Tachion, that he controlled, but he never disclosed this information to Broker F.

        ii.    *Warrior Girl's False Statements in Filings*

118.    In multiple filings posted on the OTC Markets website throughout 2009 and 2010, Warrior Girl made misstatements and omissions, including failing to disclose the extent to which the Kruses controlled the company and its number of issued and outstanding shares.  In disclosures for the periods ending December 31, 2009, March 31, 2010, June 30, 2010, and September 30, 2010, Warrior Girl stated:

> No relationships exist among and between the issuer's officers, directors, shareholders, and beneficial owners owning more than 5% of the outstanding shares.

119.    In fact, Kruse Sr., who was an officer of the issuer, held over 62 percent of the 200 million outstanding shares as of March 31 and June 30, 2010.  Tachion, a Kruse Entity, alone held at least 12 percent, 8 percent, and 22 percent on March 31, June 30, and September 30, respectively.  In addition, Warrior Girl's filings for the period ended March 31, 2010 stated

that the number of issued and outstanding shares was 75 million shares. This was false and misleading because 200 million shares were issued and outstanding after Kruse Sr. issued more than 124 million shares to himself in March 2010, in preparation for the first Warrior Girl and Moneyline campaign to manipulate the market for Warrior Girl stock.

IV.     **Moneyline Facilitates the Unregistered and Fraudulent Distribution of Everock Stock.**

      A.     *Moeller, Zangara, and Dresner Take Steps to Manipulate the Stock of Everock, a Mining-Turned Condiment Company.*

      120.    Everock was incorporated in Ontario in 1999. From 2002 until early 2004, it claimed in voluntary SEC filings to own interests in mining properties. Everock's financial statements for the three months ended December 31, 2001 indicated that Everock had nominal assets and nominal operations consisting of minimal cash and a small percentage holding of purported mining interests obtained in exchange for the issuance of 20,000 shares. In 2005, Everock re-domiciled to Nevada and announced a "restructuring . . . intended to position the company for growth in the gold mining sector." A new Nevada entity was incorporated as Everock Inc. and merged with the Canadian entity. By 2007, Moeller had gained control of Everock, and assumed the roles of president, treasurer, secretary, and sole director of the company. Although Zangara, Moeller's associate, never held any formal position at Everock, in 2008, he negotiated with, selected, retained, and paid certain expenses of Everock's transfer agent.

      121.    In July 2008, Moeller, as Everock's sole director, authorized the issuance of 300 million restricted Everock shares to himself, purportedly as payment for $30,000 of services he had rendered to the company. The issuance gave Moeller 77 percent of the outstanding shares. Moeller also authorized the issuance of 20 million shares in a private placement to an individual

investor ("Reg D Investor"), purportedly pursuant to Texas law and Rule 504 of Regulation D.

122.    In about August 2008, Everock, now controlled by Moeller, exited the mining sector and entered into another plan of reorganization, this time with Nature's Peak, Inc., described by Everock as a development stage company that manufactured and marketed natural condiment products. Everock changed its name to Nature's Peak shortly after entering into the plan of reorganization, but did not complete the merger until July 1, 2009.

123.    According to an Everock filing posted on the OTC Markets website, at about the time of the merger, Moeller purportedly stepped down from his officer and director positions and was replaced as president by the founder of Nature's Peak ("Nature's Peak Founder") and as secretary by Oppenheimer. However, Moeller, along with Zangara, maintained control of Everock through the ownership of the majority of Everock's issued and outstanding shares. Dresner, Zangara, and an associate brokered the merger between Nature's Peak and Everock.

124.    On December 3, 2008, the Reg D Investor who had received 20 million Everock shares from Moeller transferred 18.5 million of these shares to a Zangara entity, which in turn transferred most of the shares to a Zangara-controlled account at Bastille, a Moneyline Entity. This transfer brought Moeller's and Zangara's combined holdings to 82 percent of Everock's outstanding shares.

125.    In March 2009, Zangara transferred about 18 million Everock shares to a U.S. brokerage account in the name of Sandias, for the benefit of the Moneyline account of Digital Edge, an entity controlled by Dresner. According to Moneyline's internal records, on June 26, 2009, 5 million of these shares were further transferred to a promoter ("2009 Everock Promoter"), with the rest remaining in the Sandias account and credited to Digital Edge. Sandias sold 130,000 of the shares from April 23, 2009 through May 28, 2009 at ever increasing prices

from $0.04 to $0.1, which gave the appearance of legitimate market activity and raised the price to maximize the profit potential in the upcoming promotion planned by Dresner.

126.    Within three days of Digital Edge's transfer of 5 million shares to the 2009 Everock Promoter, an internet stock-touting site affiliated with the 2009 Everock Promoter began touting the stock.  On July 1, Everock announced the completion of its merger with Nature's Peak, and the coordinated promotional campaign continued until at least July 17, 2009. Everock's stock price remained steady as a result of this positive promotional campaign, enabling Moneyline to liquidate the remaining shares credited to the 2009 Everock Promoter and Digital Edge between June 26, 2009 and July 31, 2009 for proceeds of approximately $859,000.

B.    *Moeller's and Zangara's Receipt and Distribution of Everock Shares*

127.    On October 3, 2009, Everock filed with OTC Markets (posted on the OTC Markets website) an Annual Update Disclosure Statement for the period ended June 30, 2009.  In this filing, which was signed by Oppenheimer, Everock stated that Moeller had "effectively returned" 270 million of his 300 million shares and "beneficially owned" only 30 million shares. As described below, this statement was materially false and misleading.  Moeller retained control of the shares, and he and Zangara worked together in 2009 and 2010 to distribute Moeller's 300 million shares, through accounts controlled by Zangara and his associates, to control the market for Everock stock and liquidate the shares issued to Moeller at a profit.  In fact, Moeller maintained control of all the shares and parceled them out to AKAT, Zangara's entity BHI, and Moneyline accounts that Moeller and Zangara controlled over the ensuing twelve months, each time in connection with a promotional campaign (that successfully boosted the stock price and trading volume) and share dump.

128.    The following chart lists the tranches of Everock share transfers by Moeller.  No

registration statement was filed in connection with these transactions:

| Date | Transferred From | Transferred To | Number of shares |
|---|---|---|---|
| 8/20/09 "Tranche 1" | Moeller | Bastille | 70 million |
| 3/12/10 "Tranche 2" | Moeller | BHI | 45 million |
| 3/22/10 "Tranche 3" | Moeller | AKAT (promoter) | 25 million |
| 5/10/10 "Tranche 4" | Moeller | BHI | 45 million |
| 6/10/10 "Tranche 5" | Moeller | Bastille | 25 million |
| 6/22/10 "Tranche 6" | Moeller | Bastille | 45 million |
| 6/30/10 "Tranche 7" | Moeller | Bastille | 45 million |
| **TOTAL** | | | 300 million |

129.    Using accounts in the names of Moneyline Entities and Gibraltar Global

Securities Inc. ("Gibraltar"), a Bahamian entity with a business model similar to Moneyline,

Moeller and Zangara liquidated the vast majority of these shares into the trading volume that

their promotional campaign generated, funneling some shares and proceeds to Dresner,

Oppenheimer, promoters, associates, and also back to Everock.

130.    On August 20, 2009, Moeller transferred 70 million Everock shares (i.e., Tranche

1) to the Moneyline account of BHI. According to Moneyline's internal records, BHI then

transferred 65 million of those shares to the following Moneyline accounts: (i) 40 million to

Dresner's Digital Edge; (ii) 10 million to the 2009 Everock Promoter; and (iii) 15 million to

promoter Oceanic, an entity controlled by penny stock promoter, Roon. From October 1, 2009

through at least November 4, 2009, Everock issued a flurry of press releases. All 70 million

Tranche 1 shares were sold from Bastille's account at Broker C between September 11, 2009 and

November 25, 2009, for proceeds of more than $1.27 million. During the period September 24,

2009 through November 22, 2009, Coleman instructed Broker C to transfer more than $900,000

in proceeds to Bastille's U.S. bank account.

41

*Distribution of Stock Sale Proceeds Back to Everock and Dissemination of False Information*

131.    Some of the sales proceeds were funneled back to Everock.  From July 10, 2009

through December 1, 2009, Moneyline wired $719,206 to Dresner's entity, Digital Edge, which

in turn transferred: (i) $180,007 of the proceeds to BHI from July 16, 2009 through December 1,

2009; and (ii) at least $232,000 proceeds to (Oppenheimer entity) Core from July 21, 2009

through September 1, 2009.  Oppenheimer eventually, from November 12, 2009 through

November 23, 2009, transferred $102,500 to Everock.

132.    On December 14, 2009, Everock falsely announced that it had received $200,000

in new equity and debt financing from Core.  The press release quoted Oppenheimer, as CEO of

Core, stating that he was "pleased to be able to provide the capital needed . . . which will help the

Company to affirm a production schedule as planned."  In fact, this false and misleading

statement was yet another part of Everock's promotional effort, and no such financing had been

provided.  Core only transferred funds to Everock upon receiving influxes of cash from Zangara

and Dresner.

    C.    *The First 2010 Everock Promotional Campaign*

133.    On February 24, 2010, Zangara's entity BHI paid Moeller $25,000 by check, with

a memo line that stated "stock purchase."  Two weeks later, Moeller transferred 45 million

shares to BHI (Tranche 2).  Then, as detailed below, a coordinated promotional campaign began

to boost the share price of EVRN stock while Moeller, Zangara, and Moneyline dumped their

shares to profit off the price increase their promotions and manipulative trading generated:

- On March 22, 2010, Moeller transferred 25 million of his Everock shares to

    promoter Antonio Katz (Tranche 3).  Shortly thereafter, OTC Reporter, operated

    by Katz's partner Roon, touted that Everock was the "next huge move" that could

be "hitting a bounce" and had a "strategic plan for growth into a new economy," when no such plan was apparent. Between March 23, 2010 and April 19, 2010, Katz, through AKAT, engaged in a suspicious trading pattern while dumping his 25 million (Tranche 3) shares. He repeatedly bought small amounts of shares, which propped up the stock price, prior to his dumping larger blocks. For example, on March 24, he bought 220,000 shares and eight  minutes later dumped 2 million shares. The following day, he bought 83,000 shares and 13 minutes later dumped more than 3.2 million shares. This pattern repeated on March 29, March 30, March 31, April 5, and April 7.

- On March 26, 2010, Everock claimed that a natural foods supermarket chain approved the Nature's Peak product line for sale in its stores.

- On April 7, 2010, Moeller's own stock promotion business, Spectrum, located at the same address as BHI, touted that it would institute "full independent coverage" of Everock. A week later, Moeller, through Spectrum, touted improbably that with its first order from the natural foods supermarket chain, Everock now had the ability to get its products in households across America. Neither tout disclosed Moeller's substantial ownership of Everock stock.

- On April 13 and 14, 2010, Moeller sold a total of 675,000 Everock shares for proceeds of about $6,500.

- On April 23, 2010, Spectrum announced that it would release an updated report and video for Everock concerning the issuer's initiatives. . ." In its disclaimers at the bottom of each Spectrum tout, Moeller falsely promised to provide a

"balanced view" and misleadingly stated that Spectrum "may" have a beneficial

interest in Everock, when, in fact, as Moeller knew, Spectrum was Moeller's alter

ego and Moeller owned a majority of Everock shares at the time, had steadily

liquidated his Everock stock in the months leading up to the touts, and intended to

continue his liquidations.

*Distribution of Stock Sale Proceeds to UDF, Dresner, Core, and Everock*

134.    On or about March 10, 2010, just before the above-described flurry of

promotions, Zangara deposited 45 million (Tranche 2) Everock shares into BHI's brokerage

account at Broker B and then liquidated more than 38 million shares for proceeds of $374,000

from March 23, 2010 through April 21, 2010. On April 14, 2010, Zangara's UDF entity

transferred $25,000 to a promoter.

135.    Zangara, through BHI, received proceeds of $353,462 from Broker B from March

30 through April 28, 2010. He transferred those proceeds to UDF. UDF transferred nearly

$14,000 to Dresner on April 6 and 7, 2010, and a total of $175,000 in proceeds to (Oppenheimer

entity) Core from April 6 through May 3, 2010, of which Oppenheimer transferred $137,500 to

Everock.

D.    *Moeller and Zangara Carry Out an Additional Promotion of Everock*
      *in June and July 2010 to Further Enrich Themselves and Their Associates.*

136.    On May 18, 2010, Moeller transferred another 45 million shares to Zangara's

entity, BHI (Tranche 4). The very next day, the pump started, and it continued for several weeks

thereafter:

- On May 19, Everock issued a press release: "Nature's Peak Confirms it Will Meet

    its Production Commitment in May and Ship Product to its Distributors."

- On May 24, Zangara's entity UDF paid another $25,000 to the same promoter that UDF paid on April 14, 2010.

- On May 28, 2010, Everock announced: "Nature's Peak to Form Joint Venture With National Retail Marketing Network . . . to Create Multi-Brand Channel."

- On June 1, 2010, a promoter published an Everock alert stating: "I expect [Everock] to really fly tomorrow" and "[Everock] is perfect for trading." The tout indicated that UDF had financed the promotion.

During this period, BHI dumped the 45 million Tranche 3 shares, along with the remaining Tranche 2 shares, through accounts at Broker B and Gibraltar. BHI's proceeds from these sales were approximately $222,000.

E.   *Defendants Moeller, Zangara, and the Moneyline Entities Continue Their Pump and Dump Scheme Involving Everock Stock From July To September 2010.*

137.   In preparation to continue pumping-and-dumping Everock stock, from June 10 through June 30, 2010, Moeller, with the assistance of Gallison and Robin Rushing, transferred his remaining 115 million shares to Bastille (Tranches 5-7). Coleman, working with David Rushing, notified Bastille's broker-dealer to "pick up" the shares from Everock's transfer agent. Moeller directed that the shares be divided amongst the Moneyline accounts of Zangara and Zangara associates.

138.   Moneyline Individuals were aware of the planned pump-and-dump and took several steps to promote the scheme. For example:

- On June 11, 2010, Gallison moved Everock shares to different firms so that some or all of the Moneyline Entities could engage in matched trading with less risk of detection by the broker-dealers. Gallison instructed Robin Rushing to "go high

bid over at [one firm], then have [Everock] stock sold from [another firm], so I get some stock over at a place where I can offer it."

- On June 23, 2010, Gallison told David Rushing that Robin Rushing got in 70 million shares of Everock, which corresponded to Tranches 5 and 6. "They are just waiting to do their next promo. So at 7/10ths that is like a half-million dollars' worth of stock. I can make us 50,000 gross, I can get [Robin Rushing] a twenty, twenty-five thousand dollar pay check." During this call, Gallison also instructed David Rushing to conceal his IP address when logging in to brokerage accounts or transfer agent websites.

- On July 8, 2010, Gallison relayed to Robin Rushing that Moeller requested transfers of shares from his Moneyline account to other Moneyline accounts, and Robin Rushing confirmed that this was the arrangement.

- On July 13, 2010, Hiskey reported to Gallison during a telephone call that the Everock group would start a "big promo" the following week, and that she would get paid 25 percent of the commission on their accounts. Two days later, Gallison bragged to Hiskey that he "will have [the brokerage firm where Bastille held the Everock shares] relentlessly serving up stock to fulfill the appetite of the market place."

139. On July 15, 2010: Dresner recorded an "interview" that he conducted with Everock's CEO on CEOInsiderTV.com, a website controlled by Dresner that, among other things, featured Dresner's "interviews" of executives as a way to promote the executives' microcap companies. In the video promotion of the recorded interview concerning Everock, which was posted online, Dresner highlighted Everock's "significant upside potential," "high

level of financial reporting transparency," and "goal to reward shareholders."  Dresner did not

disclose any of the compensation he had received from Everock, however.

140.    On July 20, 2010, Zangara called Hiskey to discuss how he could more quickly

enter orders to sell his Everock shares on deposit with the Moneyline Entities because, as

someone "from the brokerage industry," he was concerned that there were too many people

involved in the order process.  Prior to this conversation, Zangara had called David Rushing

(based out of Spokane, Washington) to place an order to sell.  This had prompted Hiskey to

admonish Zangara not to call David Rushing even though he (David Rushing) was the one

placing the orders, because "[Moneyline is] based in Costa Rica, we need to keep the calls [in

Costa Rica]."  Hiskey said that she would relay to David Rushing any trade instructions that

Zangara placed, but "we just gotta be careful where the calls come into."  In turn, Zangara, a

New York resident, complained about the delay involved in having to place an order in Costa

Rica from New York, if the order would then come "back to New York" for processing.

Zangara stated that he had raised the issue with David Rushing, who agreed to place orders for

Zangara if Zangara contacted him directly in the U.S.  Zangara also indicated that David Rushing

had advised Zangara to enter any trade electronically and the order "goes right to" David

Rushing.  Hiskey agreed with this advice because David Rushing "is looking at the screen [that

receives orders for execution]."

141.    Toward the end of the July 20 telephone call, Hiskey suggested to Zangara that "if

this [Everock promotion] gets going and there's tons of volume and at the end of the day you

guys want to distribute [the proceeds amongst the scheme participants,]" Zangara could place all

of the sell orders on behalf of his trading group, and the Moneyline Entities could then distribute

the proceeds among the various scheme participants at the conclusion of the share dump.  Hiskey

further encouraged Zangara to call her directly for help placing orders if needed, assuring him that "if this puppy gets going . . . you can guarantee that I will make sure that I am able to [call the brokers to place trades] for you . . . don't you worry, we will make sure that the [sales] orders are [placed]." Zangara then inquired about getting assistance from a promoter that Hiskey knew who had recently operated a successful promotion. Zangara encouraged Hiskey to reach out to the promoter to let him know that Zangara's group is "all teed up and ready to go if he has an interest in doing some work . . . and . . . everybody's a winner." Hiskey ended the call by instructing Zangara to place his orders that morning electronically, or, in the worst case scenario, to call David Rushing in the U.S. to place his orders since she was would be unavailable later that day. Hiskey promised to touch base with the promoter on Zangara's behalf, and assured him that "if [she] can help sell this [Everock] stock [of Zangara's], we'll get rid of it," to which Zangara replied, "let's go, let's see what we can do, if you can help me out that would be greatly appreciated!"

142. Throughout the latter half of July 2010, Gallison and Hiskey both worked with Zangara to secure a new promoter. On or about August 20, 2010, Zangara hired someone ("2010 Everock Promoter") to tout Everock stock and instructed Moneyline to sell Zangara's shares along with any sales by the 2010 Everock Promoter's group.

143. On or about August 24, 2010, Hiskey assisted the 2010 Everock Promoter in opening a Moneyline account, and Zangara transferred 50 million shares to that account. On August 27, the 2010 Everock Promoter began promoting Everock through her Facebook account and elsewhere through at least September 8, 2010. In the meantime, Everock issued multiple press releases to facilitate the pump-and-dump scheme. For example, on August 30, 2010, an Everock press release declared: "Nature's Peak Creates New Eye-Catching In-Store Retail Point

of Sales Displays."  On September 8, 2010, Everock also issued an additional press release:
"Nature's Peak Launches Aggressive Marketing, Sales, Production and Distribution Strategy."
This was misleading at best, because there is no indication that Everock took any such steps after
this release.

144.    Between June 11, 2010 and September 15, 2010, Moneyline Entities sold 115
million (Tranche 5, 6 & 7) Everock shares for proceeds of more than $318,000.  On September
24, 2010, Bastille sent $81,400 of the proceeds to BHI, which immediately transferred this exact
amount to sister entity UDF.  UDF in turn paid $14,000 to Dresner, $10,000 to Core, and
$23,000 to another entity controlled by a Zangara associate who helped broker the merger of
Everock and Nature's Peak.

145.    All told, from April 2009 until September 2010, Moneyline Entity accounts
earned proceeds of nearly $2.5 million from the sale of Everock shares at inflated prices
bolstered by the above-described pump-and-dump scheme.  In addition, BHI earned about
$471,000 in proceeds from sales of its Everock stock from an account at Broker B in the name of
Gibraltar.  Oppenheimer assisted Zangara in liquidating Everock stock that BHI secretly
controlled by, for example, directing the transfer agent to transfer millions of shares held in
BHIs' name to that of Gibraltar, for the benefit of BHI.

F.    *Several False and Misleading Everock Filings*
      *Were Made by Oppenheimer on Behalf of Everock.*

146.    Everock's filings on the OTC Markets website from at least December 2008
through September 2010 contained multiple omissions about Everock's control parties and false
information about Moeller's disposition of his controlling block of shares.  For example,
Everock's initial disclosures for the period December 31, 2008 falsely stated that Moeller held
7.6 percent (30,000 shares) of Everock's outstanding shares instead of the nearly 77 percent

(300,062,500 shares) that he actually owned.  Additionally, as noted above, Everock falsely stated in an Annual Update Disclosure Statement for the period ended June 30, 2009 that Moeller had "effectively" returned 270 million of the 300 million restricted shares to the company when, in fact, Moeller retained control of those shares.  Everock's Quarterly Update Disclosure Statements for the periods ended September 30, 2009, December 31, 2009, and March 31, 2010 also were false and misleading because they failed to disclose that Moeller continued to be a control person of Everock after resigning his positions and that Everock unlawfully sold shares to the public in unregistered transactions through intermediaries including some of the Moneyline Entities, Moeller, Zangara, Dresner, Oppenheimer, and some of their entities.  The Quarterly Update Disclosure Statement for the period ended December 31, 2009 was false and misleading because it failed to disclose that Oppenheimer, through Core, had transferred to Everock over $100,000 in sales proceeds from the illicit sale of Moeller's Everock stock.  Everock also published materially false information about the number of authorized and outstanding shares.  For example, in its quarterly update disclosure for the quarter ended March 31, 2010, filed on May 19, 2010, posted on the OTC Markets website, Everock stated that there were 995 million authorized shares and 650,083,087 outstanding shares.  According to transfer agent records, however, there were only were 505 million authorized shares and 390,083,087 outstanding shares.  Oppenheimer, who had multiple communications with Everock's transfer agent concerning the issuer's actual number of shares and who was involved in funneling share proceeds to Everock, signed some or all of these false filings that he knew, or should have known, were false and misleading.

**FIRST CLAIM FOR RELIEF**
**Registration Provisions – Violations of Sections 5(a) and 5(c) of the Securities Act**
(The Moneyline Entities, the Moneyline Individuals,
the Kruses, the Kruse Entities, Migdall, Roon, and Oceanic)

147.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

148.    The shares of Warrior Girl that the Moneyline Entities, the Moneyline

Individuals, the Kruses, the Kruse Entities, Migdall, Roon, and Oceanic sold constitute

"securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)]

and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

149.    At all relevant times, the Warrior Girl shares that the Moneyline Entities, the

Moneyline Individuals, the Kruses, the Kruse Entities, Migdall, Roon, and Oceanic sold were not

registered in accordance with the provisions of the Securities Act and no exemption from

registration was applicable.

150.    The Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse

Entities, Migdall, Roon, and Oceanic therefore, singly or in concert, directly or indirectly,

made use of the means or instruments of transportation or communication in interstate

commerce or of the mails to offer and to sell securities when no registration statement had

been filed or was in effect as to such offers and sales of such securities and no exemption from

registration was available.

151.    By reason of the activities described herein, the Moneyline Entities, the

Moneyline Individuals, the Kruses, the Kruse Entities, Migdall, Roon, and Oceanic, singly

or in concert, directly or indirectly, have violated, and unless enjoined and restrained will

continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF
**Registration Provisions – Violations of Sections 5(a) and 5(c) of the Securities Act**
(The Moneyline Entities, the Moneyline Individuals, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge, Oppenheimer, Core, Roon, Oceanic, Katz, and AKAT)

152. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146, as if fully set forth herein.

153. The shares of Everock that the Moneyline Entities, the Moneyline Individuals, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge, Oppenheimer, Core, Roon, Oceanic, Katz, and AKAT sold constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

154. At all relevant times, the Everock shares that the Moneyline Entities, the Moneyline Individuals, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge, Oppenheimer, Core, Roon, Oceanic, Katz, and AKAT sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

155. The Moneyline Entities, the Moneyline Individuals, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge, Oppenheimer, Core, Roon, Oceanic, Katz, and AKAT therefore, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

156. By reason of the activities described herein, the Moneyline Entities, the Moneyline Individuals, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge, Oppenheimer,

Core, Roon, Oceanic, Katz, and AKAT, singly or in concert, directly or indirectly, have

violated, and unless enjoined and restrained will continue to violate, Sections 5(a) and 5(c) of

the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### THIRD CLAIM FOR RELIEF
### Fraud – Violations of Section 10(b) of the Exchange
### Act and Rule 10b-5(a) and (c) Thereunder
(The Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse Entities,
Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge)

157.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

158.     The Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse

Entities, Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge, in connection with the

purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means

or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

securities exchange, with scienter, have employed devices, schemes, and artifices to defraud, and

have engaged in transactions, acts, practices, and courses of business which operated as a fraud

or deceit.

159.     By reason of the foregoing, the Moneyline Entities, the Moneyline Individuals,

the Kruses, the Kruse Entities, Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge have

violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF
### Fraud – Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder
(Migdall)

160.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

161.    Kruse Jr., in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter, has employed devices, schemes, and artifices to defraud, and has engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

162.    Migdall knowingly or recklessly provided substantial assistance to Kruse Jr.'s violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], and is deemed to be in violation of these provisions to the same extent as Kruse Jr.

163.    By reason of the foregoing, Migdall aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FIFTH CLAIM FOR RELIEF
**Fraud - Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**
(The Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse Entities,
Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge)

164.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146, as if fully set forth herein.

165.    The Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse Entities, Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or with reckless disregard for the truth:  (a) employed devices, schemes or artifices to defraud;

and (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

166.    By reason of the foregoing, the Moneyline Entities, the Moneyline Individuals, the Kruses, the Kruse Entities, Moeller, Spectrum, Zangara, BHI, Dresner, and Digital Edge, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

### SIXTH CLAIM FOR RELIEF
**Fraud - Violations of Section 17(a)(2) of the Securities Act**
(Kruse Jr., Warrior Girl, Moeller, Oppenheimer, Everock, and Spectrum)

167.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146, as if fully set forth herein.

168.    Kruse Jr., Warrior Girl, Moeller, Oppenheimer, Everock, and Spectrum, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.    By reason of the foregoing, Kruse Jr., Warrior Girl, Moeller, Oppenheimer, Everock, and Spectrum, singly or in concert, directly or indirectly, have violated, and unless enjoined and restrained will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**SEVENTH CLAIM FOR RELIEF**
**Fraud – Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**
(Kruse Jr., Warrior Girl, Moeller, Oppenheimer, Everock, and Spectrum )

170.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

171.    Kruse Jr., Warrior Girl, Moeller, Oppenheimer, Everock, and Spectrum, directly

or indirectly, in connection with the purchase or sale of securities, by use of the means or

instruments of transportation or communication in interstate commerce or by use of the mails, or

a facility of a national securities exchange, obtained money or property by means of untrue

statements of material fact or by omitting to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

172.    By reason of the foregoing, Kruse Jr., Warrior Girl, Moeller, Oppenheimer,

Everock, and Spectrum, singly or in concert, directly or indirectly, have violated, and unless

enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**EIGHTH CLAIM FOR RELIEF**
**Manipulation - Violations of Section 9(a) of the Exchange Act**
(Gallison, Hiskey, Kruse Jr., Sandias, and Vanilla Sky)

173.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

174.    Gallison, Hiskey, Kruse Jr., Sandias, and Vanilla Sky, directly or indirectly, with

scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any

facility of any national securities exchange, or for any member of a national securities exchange,

for the purpose of creating a false or misleading appearance of active trading in Warrior Girl, or

56

a false and misleading appearance with respect to the market for Warrior Girl stock, engaged in the following unlawful activity:

        a.     Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or

        b.     Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of the securities, had been or would be entered by or for the same or different parties.

175.    Gallison, Hiskey, Kruse Jr., Sandias, and Vanilla Sky, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, effected, alone or with one or more persons, a series of transactions in Warrior Girl securities creating actual or apparent trading in those securities, or raising or depressing the price of those securities, for the purpose of inducing the purchase or sale of those securities by others.

176.    By virtue of the foregoing, Gallison, Hiskey, Kruse Jr., Sandias, and Vanilla Sky have violated, and unless enjoined will continue to violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

### NINTH CLAIM FOR RELIEF
**Unregistered Broker-Dealer - Violations of Section 15(a) of the Exchange Act**
(The Moneyline Entities and the Moneyline Individuals)

177.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146, as if fully set forth herein.

178.     The Moneyline Entities and the Moneyline Individuals, while engaged in the

business of effecting transactions in securities for the account of others, made use of the mails or

the means or instrumentalities of interstate commerce to effect transactions in, or to induce or

attempt to induce the purchase or sale of, a security without being registered in accordance with

Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

179.     By reason of the foregoing, the Moneyline Entities and the Moneyline Individuals

have violated, and unless restrained and enjoined will in the future violate, Section 15(a) of the

Exchange Act [15 U.S.C. § 78o(a)].

**TENTH CLAIM FOR RELIEF**
**Fraud, Touting - Violations of Section 17(b) of the Securities Act**
(Roon and Oceanic)

180.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

181.     Roon and Oceanic, by use of means or instrumentalities of interstate commerce or

of the mails, gave publicity to a security for consideration received, directly or indirectly, from

an issuer, without fully disclosing the receipt of such consideration and the amount thereof.

182.     By reason of the activities described herein, Roon and Oceanic have violated, and

unless restrained and enjoined will in the future violate, Section 17(b) of the Securities Act [15

U.S.C. § 77q(b)].

**ELEVENTH CLAIM FOR RELIEF**
**Control Person Liability under Section 20(a) of the Exchange Act for Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**
(the Kruses, Moeller, and Zangara)

183.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 146, as if fully set forth herein.

184.    The Kruses are, or were, directly or indirectly, control persons of Warrior Girl for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

185.    Moeller and Zangara are, or were, directly or indirectly, control persons of Everock for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

186.    As control persons of Warrior Girl, the Kruses are jointly and severally liable with and to the same extent as the controlled entity Warrior Girl for its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

187.    As control persons of Everock, Moeller, and Zangara are jointly and severally liable with and to the same extent as the controlled entity Everock for its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### TWELFTH CLAIM FOR RELIEF
**Control Person Liability under Section 20(a) of the Exchange Act for Violations of Sections, 9(a), 10(b), and 15(a) of the Exchange Act and Rule 10b-5(a) and (c)**
(Gallison)

188.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146, as if fully set forth herein.

189.    Gallison is, or was, directly or indirectly, a control person of the Moneyline Entities for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

190.    As a control person of the Moneyline Entities, Gallison is jointly and severally liable with and to the same extent as the controlled Moneyline Entities for their violations of Sections 9(a), 10(b), and 15(a) of the Exchange Act [15 U.S.C. §§ 78i, 78j(b), and 78o(a)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final

Judgment:

**I.**

Permanently restraining and enjoining:

(a)     defendants the Moneyline Entities, the Moneyline Individuals, the Kruses, the

Kruse Entities, Moeller, Zangara, BHI, UDF, Dresner, Digital Edge,

Oppenheimer, Core, Roon, Oceanic, Katz, AKAT, and Migdall, and their agents,

servants, employees, and attorneys, and all persons in active concert or

participation with them who receive actual notice of the injunction by personal

service or otherwise, and each of them, from violating Section 5 of the Securities

Act [15 U.S.C. § 77e];

(b)     defendants the Moneyline Entities, the Moneyline Individuals, the Kruses, the

Kruse Entities, Moeller, Spectrum, Zangara, BHI, Dresner, Digital Edge, Warrior

Girl, Oppenheimer, and Everock, and their agents, servants, employees, and

attorneys, and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, and each of them,

from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5];

(c)     defendants Gallison, Hiskey, Kruse Jr., Sandias, and Vanilla Sky, and their

agents, servants, employees, and attorneys, and all persons in active concert or

participation with them who receive actual notice of the injunction by personal
service or otherwise, and each of them, from violating Section 9(a) of the
Exchange Act [15 U.S.C. § 78i(a)];

(d)     defendant Migdall and his agents, servants, employees, and attorneys, and all
persons in active concert or participation with him who receive actual notice of
the injunction by personal service or otherwise, and each of them, from aiding and
abetting violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5];

(e)     defendants the Kruses, as Warrior Girl's control persons, and their agents,
servants, employees, and attorneys, and all persons in active concert or
participation with them who receive actual notice of the injunction by personal
service or otherwise, and each of them, from violating Exchange Act Section
10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(f)     defendants Moeller and Zangara, as Everock's control persons, and their agents,
servants, employees, and attorneys, and all persons in active concert or
participation with them who receive actual notice of the injunction by personal
service or otherwise, and each of them, from violating Exchange Act Section
10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(g)     defendants Roon and Oceanic, and their agents, servants, employees, and
attorneys, and all persons in active concert or participation with them who receive
actual notice of the injunction by personal service or otherwise, and each of them,
from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

(h)     defendants the Moneyline Entities and Moneyline Individuals, and their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and

(i)     defendant Gallison, as the Moneyline Entities' control person, and his agents, servants, employees, and attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Exchange Act Sections 9(a), 10(b), and 15(a) [15 U.S.C. §§ 78i, 78j(b), and 78o(a)] and Rule 10b-5 and [17 C.F.R. § 240.10b-5].

## II.

Ordering all Defendants to disgorge any and all ill-gotten gains they received as a result of the violations of the federal securities laws, plus prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## III.

Ordering all Defendants, except Migdall, to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws.

## IV.

Ordering that all Defendants are barred from participation in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section

21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], except for Gallison who is already subject

to a penny stock bar from a prior proceeding.

## V.

Ordering that the Kruses, Moeller, and Oppenheimer, pursuant to Section 20(e) of the

Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. §

78u(d)(2)], are barred from acting as officers or directors of any issuer that has a class of

securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78(l)] or that is

required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Granting such other relief as this Court may deem just and appropriate.

Dated: New York, New York
  July __14__, 2015

By: _____
  Andrew M. Calamari
  SECURITIES AND EXCHANGE COMMISSION
  Regional Director
  Nicholas Pilgrim, Senior Trial Counsel
  New York Regional Office
  200 Vesey Street, Suite 400
  New York, New York 10281-1022
  (212) 336-0924
  E-mail: PilgrimN@sec.gov

Of Counsel:
Michael Paley (PaleyM@sec.gov)
Laura Yeu (YeuL@sec.gov)