**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------  x
                          :

SECURITIES AND EXCHANGE COMMISSION,  :

            Plaintiff,         :

        -against-        :

HAROLD BAILEY GALLISON, ROBERT S.  :
OPPENHEIMER and CORE BUSINESS ONE,  :
INC., et al.,            :

           Defendants.      :

                          :

                          :

------------------------------------  x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

15 Civ. 5456 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiff, the Securities and Exchange Commission ( "SEC"), brings this action against various defendants, including Robert S. Oppenheimer ("Oppenheimer") and Core Business One, Inc. ("CBO") pursuant to Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b), 15 U.S.C. § 78j(b), and Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2). (Compl., ECF No. 37.) Plaintiff moves for summary judgment as to Oppenheimer and CBO's liability and is seeking the following relief: (1) a permanent restraint and enjoinment of violations of the securities laws; (2) disgorgement; (3) civil monetary penalties; (4) a penny stock bar; and (5) an officer and director bar. (Pl. SEC's Mem. of Law in Support of its Mo. for Summ. J. Against Defs. Robert S. Oppenheimer and Core Busines One, Inc. ("SEC MSJ"), ECF No. 279; Compl. at p. 51-63.) Oppenheimer and CBO cross-move for summary judgment to dismiss the SEC's claims.

1

(Mem. of Points and Auth. in Supp. of Def. Robert S. Oppenheimer's Mo. for Summ. J. ("Defs. MSJ"), ECF No. 280.)   Subsequently, Plaintiff filed a motion to strike certain portions of Oppenheimer and CBO's SDNY Local Rule 56.1 statement.   (Pl. SEC's Mo. to Strike Certain Portions of Def. Robert S. Oppenheimer's Local Rule 56.1 Statement, ECF No. 317.)

Plaintiff's motion for summary judgment as to Oppenheimer and CBO's liability is GRANTED.   Oppenheimer and CBO's cross motion for summary judgment is DENIED. Plaintiff's motion to strike is DENIED as moot.[1]

## I.   FACTUAL BACKGROUND

### A.  Factual History

The following facts are not disputed except where noted.

Robert Oppenheimer is the CEO and sole employee of CBO, through which Oppenheimer acts a business consultant.   (Pl. SEC's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Supp. of its Mot. for Summ. J. on Liability against Defs.' Robert S. Oppenheimer and Core Business One ("SEC SUMF"), ECF No. 283 at ¶¶ 2-3.)   In 2003, Oppenheimer began providing business advice to Paul Wilkinson ("Wilkinson") regarding Wilkinson's business, Nature's Peak, Inc. ("Nature's Peak"), of which Wilkinson was Founder, President, and CEO. (SEC SUMF ¶ 7; Defs.' Response to Pl.'s Local Rule 56.1 Statement ("Defs.' SUMF Response"),

---

[1] Plaintiff seeks to strike portions of Oppenheimer and CBO's 56.1 statement as (1) inadmissible hearsay; (2) not based on Oppenheimer's personal knowledge; (3) legal opinions and conclusions; and (4) assertions of an advice of counsel defense that Oppenheimer and CBO represented they would not rely upon. Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence. *See* Fed. R. Civ. P. 56(e); Local Rule 56.1; *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002). "[A] court may simply disregard the allegations that are not properly supported." *Pray v. Long Island Bone & Joint, LLP*, No. 14CV5386SJFSIL, 2016 WL 9455557, at *5 (E.D.N.Y. Aug. 11, 2016) (citing *Ross Univ. Sch. of Med., Ltd. v. Brooklyn–Queens Health Care, Inc.*, No. 09-CV-1410, 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) ("[C]ourts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions.")). Plaintiff's motion to strike is denied as moot.

ECF No. 323 ¶ 7.)[2] Nature's Peak was a privately held business that produced and sold vegetable dips and sandwich spreads. (SEC SUMF ¶ 4; Defs.' SUMF Response ¶ 4.) By 2007, Nature's Peak was not profitable and lacked sufficient funds to pay for production and marketing costs. (SEC SUMF ¶ 11–12.) As a result, Wilkinson asked Oppenheimer for guidance on raising capital for Nature's Peak. (Decl. of Eric M. Schmidt in Supp. of Pl.'s Mot. for Summ. J. as to Liability against Defs. Robert S. Oppenheimer and Core Business One ("Schmidt Decl."), Ex. 1 (Oppenheimer Deposition Transcript Excerpts), ECF 289-1 at 107:3-108:2.) Oppenheimer referred Wilkinson to Todd Spehler ("Spehler") (an acquaintance of Oppenheimer's), who, in turn, introduced Wilkinson to Frank Zangara[3] ("Zangara") and Mark Dresner[4] ("Dresner"). (*Id.*)

### i. Transition to Everock

In or around 2008, Spehler and Zangara recommend that Wilkinson transition Nature's Peak into a public company through a reverse merger with Everock, Inc. ("EVRN" or "Everock") — a public shell company controlled by Zangara.[5] (SEC SUMF ¶ 18; Defs.' SUMF Response ¶ 18.) Before the merger, Wilkinson consulted with Oppenheimer. (SEC SUMF ¶ 22.) Plaintiff claims that Nature's Peak was used in a "pump and dump" scheme through this reverse merger

---

[2] Oppenheimer is not an attorney. (Defs. Statement of Facts in Supp. of Mo. for Summ. J. ("Defs. SUMF"), ¶ 4.)

[3] Zangara was a defendant in this case. On Jan. 20, 2017, this Court enter a Final Judgment by consent against him. (Final J. as to Frank J. Zangara, B.H.I. Group, Inc. and U D F Consulting Inc., ECF No. 178.)

[4] Dresner was a defendant in this case. On July 8, 2019, this Court enter a Final Judgment by consent against him. (Final J. as to Def. Mark S. Dresner and Digital Edge Marketing LLC ("Digital Edge"), ECF No. 308.) Digital Edge is controlled by Dresner. (Compl. at ¶ 13.)

[5] "A shell company is a company with few or no operations." (SEC SUMF ¶ 19.)

3

with Everock.[6]  (SEC SUMF ¶ 16; Defs.' SUMF Response ¶ 16 (disputing that the pump and dump scheme was used to raise money, but rather was used to help a small group of criminals further their own illicit and concealed scheme.)

In July 2008, Charles Moeller[7] ("Moeller"), who served as EVRN's President and Chief Executive Officer, issued 300 million restricted shares of EVRN common stock to himself.[8]  (SEC SUMF ¶¶ 22, 23, 25, 29; Defs.' SUMF Response ¶¶ 22, 29 (disputing "any causal link" from Wilkinson consulting with Oppenheimer and Wilkinson agreeing to move forward with the reverse merger.)  In August 2008, Nature's Peak and EVRN entered into a reverse merger and EVRN

---

[6] "A 'pump and dump' scheme generally has three elements: (1) gaining control of a large number of shares of stock; (2) inflating the price of the stock by publishing coordinated messages such as press releases or internet posts (the "pump"); and (3) selling the shares into the artificial demand created by the pumping activities (the "dump"). (SEC SUMF ¶ 17.)  "A reverse merger is when a private company...gains access to the public capital market by merging with an existing public company.  Typically, this is accomplished by having the shareholders of the private company exchange their share for a majority of shares of a public 'shell' company."  (SEC SUMF ¶ 19.)

[7] Moeller was a defendant in this case.  On Jan. 20, 2017, this Court enter a Final Judgment by consent against him.  (Final Judgement as to Charles S. Moeller, ECF No. 177.)

[8] "Securities acquired in a private offering from the issuer, or from someone affiliated with the issuer, are generally considered 'restricted.'  Restricted stock cannot be resold unless the subsequent sale is registered or exempt from the registration requirements. Restricted securities bear a 'restrictive' legend, indicating that they cannot by resold."  (SEC SUMF ¶ 28.)

4

common stock was quoted on OTC Link.[9]  (SEC SUMF ¶¶ 20, 26; Defs.' SUMF Response ¶¶ 20, 26.)

## ii. Removal of Restrictions from Moeller's EVRN Stock

Plaintiff alleges that, from August 2009 through June 2010, Moeller and Oppenheimer through Zangara's direction, had EVRN's transfer agent[10] remove trading restrictions from Moeller's EVRN stock and transfer the 300 million shares to brokerage accounts controlled by Zangara (or his associates). (SEC SUMF ¶ 30; Defs.' SUMF Response ¶ 30 (stating "Oppenheimer lacks personal knowledge necessary to confirm or refute this statement.").)  Then stock would be sold publicly in tandem with efforts to create artificial demand for the stock. (*Id.*)

Moeller's shares were transferred through the use of "email, internet and/or telephone communications" by the Continental Transfer and Trust Company ("Continental") using the Deposit and Withdrawal at Custodian process[11], and Oppenheimer and CBO used email and facsimile to communicate with Continental concerning the transfer of Moeller's shares. (SEC SUMF ¶ 32; Defs.' SUMF Response ¶ 32 (Undisputed that Oppenheimer and CBO "used email

---

[9] "OTC Link LLC is owned by OTC Markets Group Inc., which operates OTC Link ATS, an Alternative Trading System (ATS) and electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter (OTC) securities." U.S. SECURITIES AND EXCHANGE COMMISSION, *Fast Answers: OTC Link LLC* (Last Modified: May 9, 2013), https://www.sec.gov/fast-answers/answerspinkhtm.html.

[10] "Companies that have publicly traded securities typically use transfer agents to keep track of the individuals and entities that own their stocks and bonds. Most transfer agents are banks or trust companies, but sometimes a company acts as its own transfer agent." U.S. SECURITIES AND EXCHANGE COMMISSION, *Fast Answers: Transfer Agents* (Last Modified: Mar. 2, 2012), https://www.sec.gov/fast-answers/answerstransferagenthtm.html.

[11] "Deposit/withdrawal at custodian (DWAC) is a method of electronically transferring new shares or paper share certificates to and from the Depository Trust Company (DTC) using a Fast Automated Securities Transfer (FAST) service transfer agent as the distribution point. The DWAC is one of two ways of transferring between broker/dealers and the DTC, the other being the Direct Registry System (DRS) method." James Chen, *Deposit/Withdrawal At Custodian (DWAC)*, INVESTOPEDIA (Apr. 30, 2019), https://www.investopedia.com/terms/d/dwac.asp.

5

and facsimile to communicate with Continental" as to the rest, "Oppenheimer lacks personal knowledge necessary to confirm or refute this statement.").) Plaintiff alleges that Oppenheimer directed EVRN's counsel to issue an opinion letter to Continental stating that trading restrictions on Moeller's 300 million shares could be lifted and arranged for EVRN's counsel to submit a letter to Continental to facilitate the issuance and transfer of shares without a restrictive legend. (SEC SUMF ¶¶ 35, 37–38.) Once the restrictions were lifted, Plaintiff alleges that Oppenheimer worked with Moeller and Zangara—by providing representations on behalf of EVRN—to ensure that Scottsdale Securities (one of Zangara's broker-dealers) would accept Moeller's EVRN shares. (SEC SUMF ¶¶ 40-41; Defs. SUMF Response ¶¶ 40-41 (asserting that Oppenheimer's conduct was ministerial and done at the direction and approval of Wilkinson).)

Oppenheimer and CBO contend that the SEC's assertion is a mischaracterization of the opinion letter sent from EVRN's counsel to Continental and that Plaintiff fails to cite evidence that demonstrates Oppenheimer's direction of EVRN's counsel. (Defs.' SUMF Response ¶ 37.) Further, Oppenheimer and CBO specify that Oppenheimer's conduct "was ministerial and done at the direction and with the approval of his client Wilkinson." (Defs.' SUMF Response ¶¶ 37–38.)

### iii. Oppenheimer's Alleged Role in the Misrepresentation and Sale of Unregistered EVRN Stock

Plaintiff alleges that through CBO, Oppenheimer helped complete Nature's Peak reverse merger with EVRN, obtained a ticker symbol for the newly merged EVRN so the company could be publicly traded, and reviewed and approved draft documents of Nature's Peak's financial disclosures. (SEC SUMF ¶ 33.) Oppenheimer disputes that he materially prepared documents for the merger and specifies that, while he reviewed and approved draft documents, the "[c]ontent and

financial data were prepared by other persons." (Defs.' SUMF Response ¶ 33.) Oppenheimer does not deny that "[he] sent an email requesting a ticker symbol for Nature's Peak."[12]  (*Id.*)

In addition, Plaintiff alleges Oppenheimer prepared press releases and disclosure statements to generate buying interest in EVRN stock for the pump and dump of which Oppenheimer and CBO received proceeds.  Oppenheimer and CBO contend that those press releases and statements were reviewed and approved by Wilkinson. (Defs.' SUMF Response ¶ 42.)

On October 3, 2009, EVRN submitted an Annual Update Disclosure Statement ("Oct. 3, 2009 AUDS") with OTC Markets, which was posted on the OTC Markets website. (SEC SUMF ¶ 45; Defs.' SUMF Response ¶ 45.)  Plaintiff alleges that Oppenheimer was involved in the preparation, signing, and issuance of the Oct. 3, 2009 AUDS and in "making sure that information in the filing concerning share amounts was accurate." (SEC SUMF ¶¶ 46–47; Defs.' SUMF Response ¶¶ 46–47 (disputing that Oppenheimer was responsible for making sure the information in the filing was accurate and instead sought and obtained confirmation from Wilkinson, Moeller, or legal counsel).) The Oct. 3 2009 AUDS stated that Moeller had "effectively returned" 270 million of his 300 million shares back to EVRN. (SEC SUMF ¶ 48.)

The SEC alleges that this filing was false because Moeller had returned zero shares back to EVRN. (SEC SUMF ¶ 49.)  Plaintiff maintains, through testimony from Zangara, that Oppenheimer controlled the 270 million shares and transferred control of them to Zangara to promote and sell. (SEC SUMF ¶ 49.) Oppenheimer alleges that Zangara lied at trial and that Oppenheimer "did not 'control' [EVRN] shares in anything more than a purely ministerial

---

[12] Oppenheimer and CBO dispute the assertion by Plaintiff that this means that Oppenheimer acquired the ticker symbol for EVRN. (Tr. of Proceedings 9/10/19, ECF No. 344).

capacity[.]" (Defs.' SUMF Response ¶ 49.) After the restrictions were lifted and the shares were transferred to accounts controlled by Zangara, they were then sold to the public. (SEC SUMF ¶ 50; Defs.' SUMF Response ¶ 50 (stating "Oppenheimer lacks personal knowledge necessary to confirm or refute this statement.").)

From the sale of the 300 million shares, CBO received $480,000 from accounts "in the name of Digital Edge, UDF Consulting (a company controlled by Zangara), and Moeller"— of which, Oppenheimer transferred $240,000 to EVRN, leaving $240,000 for CBO. (SEC SUMF ¶ 44.) Oppenheimer claims that this is "a complete fabrication, misrepresentation and mischaracterization of the evidence fully available to [Plaintiff][.]" (Defs.' SUMF Response ¶ 44.)

### iv. EVRN's December 14, 2009 Press Release

On December 14, 2009 Oppenheimer drafted an EVRN press release stating "[EVRN] has received more than $200,000 from CBO Business One towards its current finance round," which quotes Oppenheimer saying "I am pleased to be able to provide capital needed to support Nature's Peak's immediate cash requirements." (SEC SUMF ¶¶ 51–52; Defs.' SUMF Response ¶¶ 51–52 (specifying that while Oppenheimer drafted the press release, he did not approve or sign off on the truth of the content).) Oppenheimer has admitted that the statement in the press release was untrue. (SEC SUMF ¶ 54; Defs.' SUMF Response ¶ 54.)

Plaintiff alleges that the financing referenced in this press release consisted of funds that Dresner's Digital Edge sent to CBO, and thus "CBO did not provide 'fresh money, new financing' to Nature's Peak." (SEC SUMF ¶ 53; Defs.' SUMF Response ¶ 53 (disputing "that Oppenheimer has ever used the phrase 'fresh money, new financing' in the context described.").) Furthermore, regardless of whose funding it was, Plaintiff states that as of the date of the press release, CBO

8

had not transferred $200,000 to EVRN—the funding arrived after December 14. (SEC SUMF ¶ 55; Defs.' SUMF Response ¶ 55 (stating that the Plaintiff's statement "is unsupported by evidence that may be relied upon by plaintiff in connection with the present motion, and which properly should be excluded by the Court).) Plaintiff alleges that from July 20, 2009 through December 1, 2009, Digital Edge, made thirteen payments to CBO's bank account, aggregating $232,000. In most of those cases, Digital Edge sent CBO an email notification indicating that the payment was for an invoice issued by CBO to Digital Edge for consulting services. (SEC SUMF ¶¶ 55-58.) Plaintiff contends that Oppenheimer performed no services for Digital Edge, knew this fact, and still sent emails to Digital Edge acknowledging the funds as payment for CBO's consulting services. (*Id.*)

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002*)* (quoting *Anderson*, 411 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting

9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (internal citations omitted).

The standard for cross-motions for summary judgment is the same: a court will "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

## III. PLAINTIFF'S CLAIMS ARE TIMELY

In their briefings on the summary judgment motions at issue, the parties disagreed on whether the SEC's claims for relief (disgorgement, civil penalty, and injunction) were subject to 28 U.S.C. § 2462's five-year statute of limitations.[13] (*See* Defs.' Opp. at 10-15; Pl. Reply at 4-5.)

---

[13] 28 U.S.C.A. § 2462: "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."

10

On January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021 ("NDAA") which, in relevant part, extended the statute of limitations for SEC scienter-based claims for disgorgement to 10-years and created a 10-year statute of limitations for equitable remedies, including injunctions and bars. Those changes are applicable to any action pending at the date of the NDAA's enactment. The SEC contends that the NDAA renders Oppenheimer and CBO's arguments regarding the timeliness of Plaintiff's claims moot.[14] (SEC's Supplemental Br. at 2.) Oppenheimer and CBO do not contest the applicability of the NDAA. Instead, they contend that the NDAA violates the *Ex Post Facto* Clause of the U.S. Constitution because it attempts to revive expired claims that seek remedies that are criminal punishments. (Mem. of Points and Authorities in Reply to the SEC's Supplemental Mem. Addressing the Recent Amend. to the Statute of Limitations for Pending SEC Claims ("Defs.' Supplemental Br."), ECF No. 388, at 6.)

Oppenheimer and CBO's argument is without merit. They argue that disgorgement is necessarily a criminal penalty because the Supreme Court in *Kokesh* determined that it is a penalty for purposes of Section 2462. (Defs.' Supplemental Br. at 6); *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1638 (2017). *Kokesh*, however, is limited to its interpretation of Section 2462 and does not inform whether disgorgement is a criminal penalty for purposes of the *Ex Post Facto* Clause. *See Liu v. Sec. & Exch. Comm'n,* 140 S. Ct. 1936, 1941, 207 L. Ed. 2d 401 (2020) ("In *Kokesh*, this Court determined that disgorgement constituted a 'penalty' *for the purposes of 28 U.S.C. § 2462. . .* ) (emphasis added)); *United States v. Bank*, 965 F.3d 287, 296 (4th Cir. 2020) (citing *United States v. Dyer*, 908 F.3d 995, 1003 (6th Cir. 2018) ("*Kokesh*'s holding was 'narrow and limited solely to

---

[14] The SEC concedes that 28 U.S.C. § 2462's five-year statute of limitations "is still applicable to" the SEC's claim for civil penalties and that it is not "seeking civil penalties for any violative conduct that is outside the five-year statute of limitations." (Pl. Sec. & Exch. Comm'n Supplemental Mem. Addressing the Recent Amends. to the Statute of Limitations for Pending SEC Claims ("SEC's Supplemental Br."), ECF No. 382, at 3 n.3.)

11

the statute of limitations in 28 U.S.C. § 2462.'")). Indeed, the proper analysis for determining whether a penalizing mechanism is a criminal punishment begins with Congress' intent. Courts "'must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Smith v. Doe*, 538 U.S. 84, 93 (2003); *Abuzaid v. Mattox*, 726 F.3d 311, 317 (2d Cir. 2013) ("[w]e first look to whether the legislature, in establishing the penalty, intended it as a punishment.").

The remedies provided in Section 78u are either expressly referenced as civil or have long been held to be civil. *SEC v. Palmisano*, 135 F.3d 860, 865 (2d Cir. 1998) ("The disgorgement remedy, which has long been upheld as within [the courts'] general equity powers . . . , has not been considered a criminal sanction."). Accordingly, Congress intended to label Section 78u's disgorgement remedy as civil.

To overcome deference to Congress's intended civil designation, a defendant must present the "clearest proof" of the remedy's "punitive character" to transform the civil remedy into a criminal punishment. *Palmisano*, 135 F.3d at 864; *Bank*, 965 F.3d at 298. A court must inquire into whether the remedy is "punitive either in purpose or effect" using several guideposts that are not exhaustive:

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Palmisano*, 135 F.3d at 865. Oppenheimer and CBO do not present any proof, certainly not clear proof, that overrides Congress's civil designation. As the Second Circuit has explained,

disgorgement does "not involve an 'affirmative disability or restraint,' as those terms are normally understood." *Id.* at 866. Moreover, while disgorgement may also be instituted to prosecute a crime, may be imposed upon a finding of scienter, and serves to deter future securities violations, this remedy has not "historically been viewed as punishment" as aforementioned. *Id.* In fact, the statute makes clear that the rational purpose is to recover "any unjust enrichment by the person who received such unjust enrichment as a result of [the] violation." 15 U.S.C. § 78u(d)(3)(A)(ii); *Palmisano*, 135 F.3d at 866 (disgorgement designed with nonpunitive goal of ensuring defendant does not "profit from his illegal acts"). Disgorgement "simply restores the status quo." *Liu*, 140 S. Ct. at 1943 (citation omitted). Over the years, courts have continuously awarded disgorgement as an equitable remedy to prevent a wrongdoer's unjust enrichment, while recognizing the "countervailing equitable principle" that a wrongdoer should not be punished by paying more than a fair compensation to the person wronged. *Id.* at 1942–43. Accordingly, the NDAA's extension of the statute of limitations applicable to disgorgement does not violate the *Ex Post Facto* Clause.

Any argument that the SEC's claims seeking injunctive relief, an officer-and-director bar, and a penny stock bar are untimely, criminal penalties, this argument fails for two reasons. First, *Kokesh*'s holding solely pertains to disgorgement and has no bearing on the other remedies sought by Plaintiff. *See Kokesh*, 137 S. Ct. at 1645. Second, pursuant to the NDAA, Congress has explicitly decided that a ten-year statute of limitations applies for the SEC's injunctive relief, an officer-and-director bar, and a penny stock bar. *See* 15 U.S.C. § 78u(d)(8). Accordingly, those claims are timely because the SEC alleges misconduct from 2008 until September 2010 and filed its complaint on July 14, 2015, well within ten years of 2018 and 2020. (*See* SEC's Supplemental Br. at 6.)

13

## IV.  OPPENHEIMER AND CBO VIOLATED SECTION 5 OF THE SECURITIES ACT

Plaintiff has successfully established Oppenheimer and CBO's Section 5(a) and 5(c) liability.  To establish the requisite liability, the SEC must establish the "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."  If the SEC meets its *prima facie* burden, the burden shifts to Oppenheimer and CBO to prove the applicability of an exemption to the registration requirement.  *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).

Here, the undisputed evidence shows that a required registration statement did not exist as to the subject securities.  (Schmidt Decl. at Exhibit K.)  The undisputed evidence also shows that the offer and sale of EVRN stock involved the use of interstate transportation or communication and the mails.  (*See e.g., id.* at Exhibit A, subpart Oppenheimer Depo. Exhibit 5, at CBO_OPP04552 and CBO_OPP04757.)

Regarding the second element, the SEC alleges that, while Oppenheimer and CBO did not participate in the direct sale of the securities at issue, they were necessary participants.  (SEC SMJ at 11-13.)  "A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she 'engaged in steps necessary to the distribution of [unregistered] security issues.'"  *SEC v. Sourlis*, 851 F.3d 139, 143–44 (2d Cir. 2016) (quoting *SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941).)  "Courts in this district have held that the 'necessary participant' inquiry asks whether, 'but for the defendant's participation, the sale transaction would not have taken place — in other words, whether the defendants' acts were a substantial factor in the sale transactions." *SEC v. Genovese*, No. 17 Civ. 5821 (LGS), 2021 WL 1164654, at *3 (S.D.N.Y. Mar. 26, 2021) (quoting *SEC v. Sason*, 433 F. Supp. 3d 496, 513

(S.D.N.Y. 2020). "'As for substantial participation, to be sure it is a concept without precise bounds, but one who plans a scheme, or, at the least, is a substantial motivating factor behind it, will be held liable as a seller.'" *Id.* (quoting *SEC v. Elliott*, No. 09 Civ. 7594 (RJH), 2011 WL 3586454, at \*7 (S.D.N.Y. Aug. 11, 2011) (internal quotations and citations omitted). "'In practice, however, the 'necessary participant' and 'substantial factor' standards differ little, for no court using the 'necessary participant' test has found liable a defendant whose acts were not a substantial factor in the sales transaction." *Id.*

Oppenheimer and CBO were necessary participants in the purchase and sale of EVRN shares. Oppenheimer and CBO played a substantial role throughout the scheme beginning with participation in the reverse merger. The SEC cites to an abundance of evidence demonstrating how Oppenheimer assisted with "consummat[ing]" the reverse merger by "advising" and supporting [Wilkinson] with documentation" and communicating with various parties, including the attorney, Michael Hair and Nature's Peak's shareholders. (SEC SUMF ¶ 22; Exhibit A ("Oppenheimer Dep. Tr."), ECF No. 289-1, at 193:23-194:18.) Moeller testified that he saw Oppenheimer as his first contact regarding the transaction. (Exhibit D (Moeller Dep. Tr.), ECF No. 298-12, at 25:22-26:12.) While Oppenheimer and CBO argue that Wilkinson served as Nature's Peak's primary contact, Wilkinson's own deposition testimony demonstrates otherwise. (Exhibit B ("Wilkinson Dep. Tr."), ECF No. 289-10, at 59:11-60:10 ("**Q**: What did Mr. Oppenheimer do with respect to making Nature's Peak a public company? **A**: He helped orchestrate the –he helped—he helped with the interactions with Todd.") Oppenheimer discussed the company's ticker symbol with Wilkinson, eventually obtained the symbol for the merged entity, and got the company quoted on the OTC Link for trading. (Schmidt Decl. Ex. L, ECF No. 295, at CBO_OPP_01034-CBO_OPP_01035; CBO_OPP05789-CBO_OPP05792.) Finally,

15

Oppenheimer reviewed, edited, and sent the relevant parties the reverse merger documents. (Schmidt Decl. Ex. L at CBO_OPP01740- CBO_OPP01747; CBO-OPP01615-CBO_OPP01633.)

Once the reverse merger was complete, Oppenheimer played a substantial role in removing the restrictions on Everock's stock so it could be transferred to brokerage accounts. For example, he instructed Everock's counsel to issue an opinion letter on the restricted shares and to issue a formal letter to the transfer agent to remove the restrictions. (SEC SUMF ¶ 30-32; Schmidt Decl., Ex. L, at ROGJ-003024-ROGJ-003025, Oppenheimer Dep. Tr. at 110:9-22; 353:4-9.)

While Oppenheimer and CBO contend that Oppenheimer's conduct was ministerial and at the direction of Wilkinson, the evidence shows that Oppenheimer provided substantial assistance to ensure that Zangara's broker-dealer, Scottsdale, accepted the Everock shares. (SEC SUMF ¶ 40-41; Schmidt Decl. Ex. M, ECF No. 295, at ¶ 8-11.) Through letters and emails, Oppenheimer provided Scottsdale with the requested details on Everock's shares. (Schmidt Decl. Ex. M, ECF No. 295, at Cruz Declaration Ex. A, E.)

Finally, Oppenheimer and CBO argue (but cite to no evidence) that any Everock promotion that Oppenheimer engaged in was at the direction, approval, and review of Wilkinson or others. (Defs.' SUMF Response ¶ 42.) To the contrary, and as the SEC cites, the record is replete with evidence that Oppenheimer (1) drafted, reviewed, and authorized the release of Everock press releases (like the December 14, 2009 release); (2) prepared disclosure statements and certified that they contained no untrue statements, and; (3) convinced Wilkinson to participate in a promotional video about Everock. (SEC SUMF ¶ 42 (citing testimony from Zangara, Dresner, and Oppenheimer as well as e-mails to and from Oppenheimer regarding press releases.)

Oppenheimer contends he was an "unwitting victim[]," but the evidence in the record simply does not support such a contention. (Decl. of Def. Robert S. Oppenheimer in Opp'n to

16

SEC Mot. for Summary J., ECF No. 311, ¶ 49.) Oppenheimer had much more than a "minimis or insubstantial role" in the transactions at issue and was, indeed, a necessary participant under Section 5. *See S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1257 (9th Cir. 2013). There is a strong likelihood that, but for roles played by Oppenheimer and CBO, the reverse merger would not have occurred. (*See* Wilkinson Dep. Tr. at 58:20-25 (Wilkinson acknowledging that he "wouldn't know how to take a company public.") Thus, Plaintiff's motion for summary judgment as to Oppenheimer and CBOs' Section 5(a) and 5(c) liability is granted.

## V.   OPPENHEIMER AND CBO VIOLATED SECTIONS 10(b) and 17(a)(2) OF THE SECURITIES EXCHANGE ACT

Plaintiff has successfully established Oppenheimer and CBO's Section 10(b) and 17(a)(2) liability. To prevail on its Section 10(b) and Rule 10b-5 claim, the SEC must establish that Oppenheimer (and, through Oppenheimer, CBO) "(1) made a material misrepresentation or a material omission as to which he had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale" of securities. *Sec. & Exch. Comm'n v. Im*, No. 17-CV-3613 (JPO), 2020 WL 4937465, at *2 (S.D.N.Y. Aug. 24, 2020). Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities using the mails or the instrumentalities of interstate commerce. *Sec. & Exch. Comm'n v. Yorkville Advisors*, LLC, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018). Claims under Section 17(a) of the Securities Act have essentially the same elements as those under Exchange Act Section 10(b) and Rule 10b–5. However, claims brought under Sections 17(a)(2) only require proof of negligence. *Id.*

The materiality requirement requires a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *S.E.C. v. Greenstone Holdings, Inc.*, No. 10 CIV. 1302

MGC, 2012 WL 1038570, at *5 (S.D.N.Y. Mar. 28, 2012), *aff'd in part sub nom. Sec. & Exch.*
*Comm'n v. Frohling*, 851 F.3d 132 (2d Cir. 2016).

Scienter is a mental state "embracing intent to deceive, manipulate, or defraud." *Yorkville*
*Advisors, LLC*, 305 F. Supp. 3d at 511–12 (citation omitted). At the summary judgment stage, the
SEC "must produce evidence '(1) showing that the defendants had motive and opportunity to
commit fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or
recklessness.'" *Id.* Motive entails "concrete benefits that could be realized by one or more of the
false statements and wrongful nondisclosures alleged." *Id.* Opportunity consists of "the means
and likely prospect of achieving concrete benefits by the means alleged." *Id.* Conscious
misbehavior is conduct that is "highly unreasonable" and "represents an extreme departure from
the standards of ordinary care to the extent that the danger was either known to the defendants or
so obvious that the defendant must have been aware of it." *Id.* Actual knowledge of or conscious
disregard of numerous red flags can establish scienter. *Id.* However, general allegations of red
flags are insufficient to demonstrate scienter. *Id.* To survive a motion for summary judgment, the
plaintiff must provide admissible evidence that defendants were aware of facts or had access to (i)
information contradicting their statements, or (ii) facts demonstrating that defendants failed to
review or check information that they had a duty to monitor. *Id.* Plaintiff must identify specific
information that defendants knew, had access to, or had a duty to review. *Id.*

The SEC cites two publications, the Oct. 3, 2009 ADS and the Dec. 14, 2009 press release,
as material misstatements made by Oppenheimer and CBO in violation of 10(b) and 17(a)(2).
(SEF SUMF ¶¶ 45-55.) In their opposition and cross-motion, Oppenheimer and CBO argue that
those statements should not be considered since they were made outside of the limitations period.

As this Court has already reasoned, the SEC's claims regarding those statements are timely. [15] Nevertheless, this Court will analyze the SEC's claims for sufficiency for summary judgment.

### a. October 3, 2009 Disclosure Statement

There is no genuine dispute as to whether Oppenheimer and CBO made a material misrepresentation in the October 3, 2009 disclosure statement.[16] "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Greenstone Holdings, Inc.*, 2012 WL 1038570, at *5.

Oppenheimer testified at his deposition that:

"I contributed to some editing and working on the [disclosure statement] document as well, and then we signed off on it and filed it . . . **Q.** Did you sign these disclosure statements? **A.** Yes. And so did Paul. **Q.** But you signed as well; correct? **A.** Correct. **Q.** Based on your review; right? **A.** Based on my review believing that that was all accurate information from the – and the work that we had done together."

(Oppenheimer Depo. Tr. 197:15-17, 200:25-201:7.) Further, that Moeller returned 270 million of his 300 million Everock shares is a fact that an investor would find important in deciding whether to buy or sell shares. *Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp.

---

[15] Oppenheimer and CBO proffer that the only statement made by Oppenheimer during the 28 U.S.C. § 2462 statute of limitation period is a July 19, 2010 press release regarding product tasting and demonstration at Whole Foods Market. The record does not establish scienter or even negligence for this press release. It is not evident that Oppenheimer consciously disregarded or negligently disregarded whether this July 19 statement was false or misleading when it was drafted and released.

[16] The relevant portion of the October 3, 2009 disclosure statement stated: "[I]n 2008 the Company issued '300,000,000 restricted shares to Mr. Charles Moeller, who was President of the Company at that Time, in exchange for prior services valued at $30,000.00. Subsequently Mr. Moeller effectively returned 270,000,000 of these shares to the Company in connection with the acquisition of Nature's Peak [*sic*] a California corporation. Subsequent to and as a result of the effect of the share exchange agreement and plan of reorganization, by and between Everock, Inc. and Nature's Peak, a new Board of Directors and control of shares was established. The new Board of Directors was seated effective November 2008." Schmidt Decl., ECF No. 295-7, Oppenheimer Depo. Ex. 21 p. 6, ¶ 7.

3d 196, 206 (S.D.N.Y. 2021). Finally, it is undisputed that the October 3, 2009 statement was false. *See* Oral Argument Tr. at 68:14-69:3, 80:20-23, ECF No. 344, argued September 10, 2019 ("OA Tr."). Moeller's shares had not been returned to Everock but had instead been transferred to Zangara controlled brokerage accounts. (SEC SUMF ¶ 50.)

The record supports the conclusion that Oppenheimer knew the statement was false when made. In his own deposition testimony, Oppenheimer stated that, to his knowledge, the 270 million shares "were not returned" and that he knew the disclosure statement that he signed "had to be fair and accurate" and "truthful". (Oppenheimer Depo. Tr. 337:14-21, 360:21-25.) Moreover, the SEC argued that scienter should be inferred from Oppenheimer's conduct before the disclosure statement was released—*i.e.* that his coordinating the removal of EVRN's trading restrictions and helping to transfer Moeller's shares to Zangara's brokerage accounts directly contradicts the content of the October 3rd disclosure statement. *See* OA Tr. at 21:7-11, 22:15-22, 26:20-23; *Sec. & Exch. Comm'n v. Simeo*, No. 19 CIV. 8621 (JPC), 2021 WL 4041562, at *10 (S.D.N.Y. Sept. 3, 2021) ("[T]he evidence in the record regarding [defendant's] conduct easily supports the conclusion that he acted with the requisite scienter.")

The SEC's evidence of Oppenheimer's conduct establishes the requisite scienter for the October 3, 2009 disclosure statement. At the time the disclosure statement was issued, Oppenheimer must have known that Moeller's shares had not, in fact, been returned to Everock because only a few months prior, Oppenheimer and Moeller began instructing Everock's transfer agent to remove trading restrictions from the stock and to transfer the stock to Zangara controlled brokerage accounts. (SEC SUMP ¶30, 32; Continental Decl. ¶ 10-16 and Ex. A.) This transfer continued even after the October 3 disclosure statement was released. (SEC SUMP ¶30, 32; Continental Decl. Ex. A-J.)

This evidence does not lend itself to the notion, as Oppenheimer and CBO argue, that Oppenheimer was "an unwitting instrumentality", simply "at the wrong place at the wrong time", or someone who was taken advantage of by other defendants in this case. (Defs. Opp. to SEC SJM at 22; Defs SJM at 22.) Testimony by those other defendants supports this conclusion. (*See* Schmidt Decl. Ex. DD, Moeller Depo. Tr. at 70:24-71:19 ("Mr. Oppenheimer was aware of everything that was going on, everything. If Paul had someone he leaned on in this process at all, it was Robert Oppenheimer; and Robert Oppenheimer's incredible intention [*sic*] to detail and every -- if his hair-splitting requests he had doesn't reflect that he knew everything, I don't know what does."); Ex. FF at SEC-Moeller C-E-0000234 (Email from Zangara to Moeller, dated Aug. 30, 2008, "Oppenheimer is like his [Wilkinson's] in house counsel who is on our side. . . .").) Thus, the evidence establishes Oppenheimer and CBO's scienter for the Oct. 3 ADS.

Plaintiff's motion for summary judgment as to Oppenheimer and CBO's Section 10(b) and 17(a)(2) liability for the Oct. 3 ADS is granted.

### b. December 14, 2009 Press Release

There is similarly no genuine dispute as to whether Oppenheimer and CBO made a material misrepresentation in the December 14, 2009 press release.[17] (*See* Oppenheimer Depo Tr. at

---

[17] The December 14, 2009 press release stated in relevant part that: "Everock, Inc. . . . announced today that it has received more than $200,000.00 from Core Business One toward its current finance round. "I am pleased to be able to facilitate capital necessary to support Nature's Peak immediate cash requirements and move us forward to having production scheduled, said Robert Oppenheimer, CEO of Core Business One." "Nature's Peak will issue preferred shares and a promissory note for a portion of the funds received The shares will be restricted and not tradeable, said Paul Wilkinson, President and CEO of Nature's Peak" Paul continued, "We are very happy to work with Robert and Core Business One and their demonstrated commitment to Nature's Peak is very much appreciated." (Oppenheimer Depo. Ex. 6 at p. 4.)

282:13-283:9 (Oppenheimer admitting that he worked on the December 14, 2009 press release); *id.* at 290:2-291:22 (the statement made in the press release was "not true"; OA Tr at 66:10-67:6.)

Oppenheimer knew the statement was untrue when made. (*See* Oppenheimer Depo. Tr. at 290:2-291:22 (Oppenheimer admitting that CBO "did not provide fresh money, new financing to Nature's Peak" and that it was actually "Digital Edge that was providing the funds through Core financing. . . ."; SEC SUMF ¶56-58; OA Tr. at 66:22-67:11; 80:12-81:3 (Defense counsel admitting that Oppenheimer made false statements and knew they were false when made)) Finally, as of December 14, 2009, only $102,500 had been transferred to Everock. (Schmidt Decl. Ex. O at ¶ 8.) The record is replete with emails from Digital Edge and replies from Oppenheimer and CBO showing that, for over a year before the December 14, 2009 press release, CBO received payments from Digital Edge. (SEC SUMF ¶56-58.) Thus, Oppenheimer must have known that the money paid to Everock was not actually CBO's own funding.

Thus, Plaintiff's motion for summary judgment as to Oppenheimer and CBO's Section 10(b) and 17(a)(2) liability is granted for the December 14, 2009 press release.

## VI. CONCLUSION

Plaintiff's motion for summary judgment as to Oppenheimer and CBO's liability is GRANTED in its entirety. Oppenheimer and CBO's cross motion for summary judgment is DENIED. Plaintiff's motion to strike is DENIED as moot.

Dated: New York, New York
       February 28, 2022

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

---

continued, "We are very happy to work with Robert and Core Business One and their demonstrated commitment to Nature's Peak is very much appreciated." (Oppenheimer Depo. Ex. 6 at p. 4.)